Date signed September 24, 2014



DUNCAN W. KEIR
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In Re: | * | |
| TMST, Inc. (f/k/a Thornburg Mortgage, Inc.), *et al.,* | * | Case No. 09-17787-DK |
| | * | Chapter 11 |
| | * | Jointly Administered |
| Debtors | * | |
| ************************************** | * | |
| Joel I. Sher in his capacity as Chapter 11 Trustee for TMST, Inc., TMST Hedging Strategies, Inc. and TMST Home Loans, Inc., | * | |
| | * | |
| | * | |
| Plaintiff | * | |
| vs. | * | Adversary No. 11-340 |
| JP Morgan Chase Funding Inc., *et al,* | * | |
| | * | |
| | * | |
| Defendants | * | |

### Memorandum of Decision

Before the court is the Defendants' Joint Motion to Dismiss First Amended Complaint (the

"Motion to Dismiss"). Defendants filed a joint Motion to Dismiss[1] and Memorandum of Law in

---

[1] Shortly after the filing of the Motion to Dismiss, Defendants filed a Motion for Withdrawal of Reference seeking to have this adversary proceeding withdrawn to the United States District Court for the District of Maryland. That request, once fully briefed by the parties, was transmitted to the District Court on January 13, 2012. For reasons stated in its Order entered July 23, 2012, the District Court denied the Defendants' Motion.

support thereof and a reply to the opposition and supplements (collectively, the "Motion to Dismiss"). Citigroup Global Markets, Inc. and Citigroup Global Markets Limited jointly filed a supplemental memorandum setting forth grounds unique to their request for dismissal. Defendants set forth their grounds for dismissal under the safe harbor provisions of Section 546 of the Bankruptcy Code[2], Federal Rule of Bankruptcy Procedure 7012, incorporating Federal Rule of Civil Procedure 12(b)(6), and Federal Rule of Bankruptcy Procedure 7056, incorporating Federal Rule of Civil Procedure 56. Plaintiff has filed an Opposition to the Motion to Dismiss and both parties have filed further supplemental pleadings. The court held a hearing upon the Motion to Dismiss on May 1, 2013.

## I. Jurisdiction

The court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

## II. Chapter 11 Cases

Plaintiff is the Chapter 11 Trustee for four related Debtor entities (i) TMST, Inc. f/k/a Thornburg Mortgage, Inc. ("TMST"), (ii) TMST Home Loans, Inc. f/k/a Thornburg Mortgage Home Loans, Inc. ("TMHL"); (iii) TMST Hedging Strategies, Inc. f/k/a Thornburg Mortgage Hedging Strategies, Inc., and (iv) TMST Acquisition Subsidiary, Inc. f/k/a Thornburg Acquisition Subsidiary, Inc. (collectively, "Debtors"). The Debtor entities filed bankruptcy under chapter 11 of the Bankruptcy Code on May 1, 2009 (the "Petition Date"). Prior to filing, the Debtors' business

---

[2] All future statutory references will be to the United States Bankruptcy Code at title 11 of the United States Code, unless described otherwise.

2

consisted of several entities, TMST being the largest and only publically traded entity[3] and which was held for income tax purposes as a Real Estate Investment Trust ("REIT"). The remaining Debtors were held as wholly-owned or indirect subsidiaries of TMST. TMST focused on investing primarily in high quality rated luxury mortgages and TMHL was a taxable REIT subsidiary of TMST that acquired, securitized and serviced mortgage loans. TMST Hedging Strategies, Inc. and TMST Acquisition Subsidiary, Inc. performed no significant operations at the time of filing.[4] All Debtors were managed by a non-debtor affiliated company known as Thornburg Mortgage Advisory Corporation.

At the outset of the bankruptcy cases, Debtors acted as debtors in possession with the rights and powers so provided by Section 1107(a). Upon motion to appoint chapter 11 trustee filed by the United States Trustee and after a trial thereupon, the court ordered the appointment of a Chapter 11 trustee. Joel Sher was appointed chapter 11 trustee on October 28, 2009 in the bankruptcy cases of all related Debtors, except for Adfitech (for which the request had been voluntarily withdrawn by the United States Trustee).

### III.  The Amended Complaint

The adversary proceeding now before the court was initiated by the filing of a 21-count

---

[3] TMST was delisted from the New York Stock Exchange in December of 2008.

[4] An additional related corporation filed along with the Debtors named herein - Adfitech, Inc. ("Adfitech). Adfitech operated independently from the other Debtors, specializing in providing mortgage loan auditing services to residential mortgage noteholders. Initially, Adfitech's case was jointly administered with the Debtors' cases until November 2, 2009 when the Joint Administration was severed as to Adfitech. Adfitech's chapter 11 plan has been confirmed and the case is now closed.

complaint on April 30, 2011,[5] and thereafter amended on June 8, 2011 to add an additional ten

counts.[6] The nine defendants are (1) JPMorgan Chase Funding Inc. ("JPMorgan"), a subsidiary of

JPMorgan Chase & Co., an investment banking and securities firm, incorporated under the laws of

the state of Delaware with its principal place of business in New York; (2) Citigroup Global

Markets Limited ("Citi Global Ltd"), a subsidiary of Citi Global Markets Europe Limited, an

investment banking and securities firm, formed under foreign law, with its principal place of

business in England, that transacts business throughout the United States; (3) Citigroup Global

Markets, Inc. ("Citigroup Global Inc.", and collectively with Citi Global Ltd, "Citi") a corporation

formed under the laws of the state of New York with its principal place of business in New York;

(4) Credit Suisse Securities (USA) LLC ("CSSU") an investment banking and securities firm,

formed under the laws of the state of Delaware with its principal place of business in New York; (5)

Credit Suisse International ("CSI", collectively with CSSU, "Credit Suisse"); an investment

company dealing in over-the-counter derivatives, formed under foreign law, with its principal place

of business in England, that transacts business throughout the United States; (6) RBS Securities,

---

[5] Section 546 contains the limitations period for causes of action brought pursuant to Sections 544, 547 and 548 to avoid certain transfers, including the majority of claims brought by this adversary proceeding. Section 546(a) in provides:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of -

(1) the later of -

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section ... 1104... of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

[6] On July 7, 2011 the court denied the Motion to Intervene filed by the Official Committee of Unsecured Creditors for TMST (Docket entry 21).

Inc. ("RBS Securities") (f/k/a Greenwich Capital Markets Inc.), an investment banking and securities firm, incorporated under the laws of the state of Delaware, with its principal place of business in Connecticut; (7) Greenwich Capital Derivatives Inc. ("GCD"), an investment banking firm dealing in over-the-counter derivatives, incorporated under the laws of the state of Delaware, with its principal place of business in Connecticut; (8) The Royal Bank of Scotland PLC ("RBS PLC", and collectively with RBS Securities (f/k/a Greenwich Capital Markets, Inc.) and GCD, "RBS"), an investment banking and securities firm dealing in over-the-counter derivatives, formed under foreign law, with its headquarters in Edinburgh, Scotland, that transacts business throughout the United States; (9) UBS AG, an investment banking and securities firm, incorporated under foreign law, with its headquarters in Switzerland, that transacts business throughout the United States.

In the lengthy complaint Plaintiff outlines a series of events involving the Debtors and Defendants leading first to the execution of restructuring agreements, then to releases, forbearance agreements and eventually to the Debtors' chapter 11 bankruptcy filings.[7]

The Amended Complaint alleges the following. TMST financed its acquisition of mortgage backed securities ("MBS") by entering into financing agreements with investment and securities firms.[8] TMST focused on investing in high rated MBS supported primarily by adjustable rate mortgages.[9] The typical financing agreements for TMST were repurchase agreements or reverse

---

[7] *See infra* note 54. For purposes of the Motion to Dismiss, while the court dismisses the characterizations of the alleged facts, it does accept the factual allegations themselves as true. *Papsan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986) (refusing to recognize as true legal conclusions "couched as ... factual allegation[s]").

[8] *Amended Complaint* at ¶ 20.

[9] *Id.* at ¶ 19.

repurchase agreements which were subject to the agreements set forth in global master financing agreements and master purchase agreements.[10]  During the time period of March 30, 2006 through March 14, 2008, Debtors entered into such agreements with Defendants.[11]

TMST's primary source of income derived from the net of the interest income earned on the MBS and the costs of the repurchase transactions.[12]  The initial transactions between TMST and Defendants at issue in this litigation were typical examples of TMST's method of financing its acquisition of the MBS.[13]  Simply stated, for the repurchase agreements TMST would acquire MBS (with its own funds and advanced funds of the investment firm) and sell them to a Defendant with a requirement that TMST would repurchase them at a later date (less than one year) as set forth in the agreement.[14]  In the reverse repurchase agreements, those buyer/seller roles were reversed.  In the repurchase scenario, the buyer would establish a value for the MBS and apply a percentage discount known as the "haircut" to that price (typically, the higher rated the MBS, the lower the haircut percentage) and use that calculation to determine how much to lend against that MBS.[15]

Under the repurchase agreements TMST retained the beneficial economic ownership of the MBS including the right to receive the principal and interest collected on the mortgages underlying

---

[10] *Id.* at ¶ 20.

[11] Plaintiff references eleven separate agreements between TMST and one or more Defendants *(id.* at ¶¶ 10-18) and two Master Repurchase Agreements between TMHL and Defendant Greenwich Capital Financial Products, Inc. and TMHL and Defendant Credit Suisse First Boston Mortgage Capital LLC.  *Id.* at ¶ 28.

[12] *Id.* at ¶ 26.

[13] *Id.* at ¶ 20.

[14] *Id.*

[15] *Id.* at ¶ 22.

the MBS.[16]  Another aspect of the repurchase transactions was the right of the buyer to make margin calls upon the seller when the value of the MBS fell below a certain value and the rights of the seller to make a margin call on buyer when the price rose above a certain level.[17]

TMHL was in the business of originating, acquiring, securitizing and servicing residential mortgage loans.[18]  TMHL financed the majority of its origination and acquisition activities through warehouse lending facilities with Credit Suisse Boston Mortgage Capital LLC (non-defendant entity) and Greenwich Capital Financial Products, Inc. (non-defendant entity).[19]  TMHL would initiate a securitization of its amassed mortgage loans by transferring the loans to a special purpose entity which acted as a depositor who then transferred the loans to a mortgage security trust created for that securitization.  The trust would issue different classes of MBS for public offering.[20]  TMHL sponsored more than thirty trusts.[21]  The highest quality tranches would be offered for sale to third parties and TMST would purchase the subordinate tranches.[22]  TMST would often enter into repurchase agreements with third parties to finance the acquisition of those MBS.[23]

Beginning in 2008 one or more of the Defendants, citing a sudden decline in value of the securities, began to make significant margin calls with respect to the repurchase transactions and the

---

[16] *Id.* at ¶ 23.

[17] *Id.* at ¶ 24.

[18] *Id.* at ¶ 27.

[19] *Id.* at ¶ 28.

[20] *Id.* at ¶ 29.

[21] *Id.* at ¶ 30.

[22] *Id.*

[23] *Id.*

backend swaps.  These margin calls significantly depleted the Debtors' liquidity.[24]  Prior to entry

into the Override Agreement,[25] the Debtors' repurchase agreements generally were governed by the

September 1996 version of the form Master Repurchase Agreement ("MRA") published by the

Bond Market Association (n/k/a the Securities Industry & Financial Markets Association).[26]  Under

the MRAs, either party could make a margin call if the market value of the collateral fluctuated

beyond the set margin amounts.  The calculation of the market value of the MBS was to be

determined from a "'generally recognized source agreed to by the parties or the most recent closing

bid quotation from such a source.'" plus accrued income not otherwise excluded.[27]  Not all the

Defendants' MRAs used the standard calculation.  For example, the MRA with Defendant RBS

PLC used the form definition, but the MRAs with CSSU, RBS Securities, UBS, Citi and JP Morgan

contained annexes to modify the definition to require the market value of an MBS be determined

based on specific pricing sources.[28]  The failure to meet a valid margin call gave the issuing party

the right to declare an Event of Default.[29]

On February 28, 2008 prior to the markets opening, TMST issued its 2007 10-K.[30]  The 10-

K provided that in the prior two weeks TMST had received over $300 Million in margin calls.

TMST reported that it had met all outstanding margin calls as of the day prior but revealed that its

---

[24] *Id.* at ¶¶ 44- 45.

[25] *See infra* note 37 and accompanying text.

[26] *Amended Complaint* at ¶ 35.

[27] *Id.* at ¶ 38 (citing the MRA).

[28] *Id.* at ¶ 40.

[29] *Id.* at ¶ 43.

[30] *Id.* at ¶ 46.

liquidity to satisfy future margin calls was greatly reduced.[31]  Within a matter of hours after issuing the 10-K, TMST received over $150 Million in additional margin calls from Defendants.[32]  Over the next six days, TMST received further margin calls and by March 6, 2008 having received $610 Million in additional margin calls, was unable to satisfy them in full.[33]  Plaintiff alleges that the calculations of amounts due under the margin calls were the result of improper pricing by Defendants.[34]

TMST began negotiations with Defendants to restructure its debts during the second week of March 2008 under the pressure of continuing margin calls.[35]  At that time none of the Defendants had called an Event of Default to begin a liquidation of the MBS.[36]  On March 17, 2008, TMST, TMHS (not TMHL) and Defendants entered into the Override Agreement.[37]  The Override Agreement had several key components.  Although far from a complete summary, three key components of the Override Agreement were that it created an Override Period of 364 days within which repurchase dates under existing repurchase agreements were extended, created a standstill period for invoking margin calls and required TMST and TMHS to raise no less than $1 Billion of

---

[31] *Id.* at ¶¶ 45-46.

[32] *Id.* at ¶ 47.

[33] *Id.* at ¶ 49.

[34] *Id.* at ¶¶ 47-54.

[35] *Id.* at ¶ 55.

[36] *Id.* at ¶ 54.

[37] *Id.* at ¶ 56.

new capital.[38]   The additional capital would be used, *inter alia,* to satisfy a portion of the

Defendants' unpaid margin calls and create a "Liquidity Fund" with a market value of no less than

$350 Million.[39]  TMST completed the new capital raise on March 31, 2008 by the issuance of

Senior Subordinated Notes, raising $1.15 Billion.[40]  Of the proceeds, $524.5 Million went to

Defendants immediately, $350 Million went to the Liquidity Fund, $31.2 Million was paid to

satisfy deficiency claims to counterparties not party to the Override Agreement and $58.2 Million

was paid in connection with expenses related to the transaction.[41]

     Despite the additional capital raised and the respite period envisioned by the Override

Agreement, Debtors continued to experience liquidity deficiencies due to the Defendants'

downgrades of the MBS.[42]  TMST was prohibited by the Override Agreement from entering into

new MBS transactions and the agreement further limited the amount Debtors could have

outstanding under their warehouse lending agreements.[43]  During the months following the Override

Agreement, Debtors began to challenge the rights of Defendants to collect both adjusted (due to

downgrades of the MBS) haircut and margin payments.[44]  Plaintiff alleges that under mounting

---

[38] *Id.* at ¶¶ 58-60, 64-66.  Plaintiff points to these two provisions in the Override
Agreement as well as the provisions regarding collection and payment of the principal and
interest payments received under the mortgages underlying the MBS in his argument that the
original repurchase transactions ceased having the characteristics of a repurchase agreement
under the Override Agreement.  *See* discussion *infra* Part IV.A.1.

[39] *Id.* at ¶¶ 66-67.

[40] *Id.* at ¶ 80.

[41] *Id.* at ¶ 81.

[42] *Id.* at ¶¶ 86-90.

[43] *Id.* at ¶ 72.

[44] *Id.* at ¶¶ 96-99.

pressures by Defendants and the refusal of Defendants to turn over the MBS principal and interest payments, TMST began to negotiate a forbearance with Defendants, who were separately negotiating how to divide the Liquidity Fund between them.[45]

During the following months, Plaintiff alleges that Defendants continued to make aggressive margin calls.  As TMST began to dispute the Defendants' rights to both haircuts and margin payments, Plaintiff alleges that Defendants threatened liquidation and demanded additional payments from the liquidation fund.[46]

On December 12, 2008, TMST, TMHL, TMHS and Defendants entered into an Amended and Restated Override Agreement (the "Amended Override Agreement").[47]  The Amended Override Agreement provided, inter alia, that the maturity/repurchase date of the repurchase agreements would remain the same, Defendants would retain the principal and interest collected on the MBS, distribution of $72.3 Million from the Liquidity Fund would be directed to Defendants, additional distributions to Senior Notes interest payments would be restricted and further provided that Debtors could use certain Liquidity Funds to meet operating expenses.[48]  In addition, the Amended Override Agreement granted to Defendants a release of certain claims by Debtors and provided a ratification of existing obligations and liabilities by Debtors, described by the Amended Complaint as the "First Release."[49]

---

[45] *Id.* at ¶¶ 100-121.

[46] *Id.* at ¶¶ 103-110.

[47] *Id.* at ¶ 136.

[48] *Id.* at ¶ 137.

[49] *Id.* at ¶¶ 143, 145.

Following the execution of the Amended Override Agreement, Debtors and Defendants negotiated an extension of the March 16, 2009 maturity date while discussing the Debtors' long-term restructuring plans.  During the time period of these discussions, Debtors allege that some Defendants (Citi and UBS) continued to take a position of refusal regarding any extension in what Debtors describe as an exercise of "leverage and control" over Debtors.[50]  Debtors entered into additional and separate agreements with various Debtors (the "March Forbearance Agreements")[51] that contained what Plaintiff describes as the "Second Releases."

In the last week of March 2009 and under pressure from Defendants allegedly threatening to terminate their agreements with Debtors and exercise their rights in collateral, Debtors made a public disclosure that they would be filing Chapter 11 bankruptcy cases.[52]  On March 31, 2009 Debtors entered into one amended forbearance agreement with RBS, Credit Suisse and JP Morgan and another with Citi/UBS.[53]  Nonetheless, Debtors filed bankruptcy on May 1, 2009.

The Amended Complaint seeks (A) avoidance under Section 548(a)(1)(B) (constructive fraud) of the Override Agreement and Amended Override Agreement and transfers associated therewith (Counts 1, 9, 2, and 11, respectively), March Forbearance Agreements (Count 17), and Second Releases (Count 21) (collectively, the "Bankruptcy Code Constructive Fraud Counts"); (B) avoidance under Section 544(b) and state law constructive fraud of the Override Agreement and Amended Override Agreement and transfers associated therewith (Counts 4, 13, 5, and 15,

---

[50] *Id.* at *¶ 161.  See generally id.* at ¶¶156-161.

[51] *Id.* at ¶¶ 156-168.

[52] *Id.* at ¶ 174.

[53] *Id.* at ¶¶ 175-176.

respectively), March Forbearance Agreements (Count 19) and Second Releases (Count 23) (collectively, the "State Law Constructive Fraud Counts"); (C) avoidance under Section 548(a)(1)(A)(actual fraud) of the Override Agreement transfers (Count 3) and Amended Override Agreement and transfers associated therewith (Counts 8 and 10, respectively), March Forbearance Agreements (Count 16), and Second Releases (Count 20) (collectively, the "Bankruptcy Law Actual Fraud Counts"); (D) avoidance under Section 544(b) and state law actual fraud of the Override Agreement Transfers (Count 6), Amended Override Agreement and related transfers (Counts 12 and 14, respectively), March Forbearance Agreements (Count 18) and Second Releases (Count 22) (collectively the "State Law Actual Fraud Counts"); (E) avoidance as preferential transfers under Section 547(b) of the Override Agreement Transfers (Count 24), the Amended Override Agreement Transfers (Count 25) and Second Releases (Count 26) (collectively the "Preference Counts"); (F) Breach of the Override Agreement under state law (Count 7) (the "Override Breach Count"); (G) Breach of the Repurchase Agreements and Turnover (Count 27) (the "Breach of Repurchase Agreement Count"); (H) rescission of named agreements due to duress and/or coercion (Count 28) (the "Duress Count"); (I) equitable subordination of claims pursuant to Sections 105(a), 502(b) and 510(c) (Count 29) (the "Equitable Subordination Count"); (J) equitable disallowance of claims pursuant to Sections 105(a), 502(b) and 510(c) (Count 30) (the "Equitable Disallowance of Claim Count"); and (K) disallowance of claims pending turnover under Sections 105(a), 502(b) and 510(c) (Count 31) (the "Disallowance Pending Turnover Count").   Total damages sought exceed $1.9 Billion.

## IV. Analysis

### A. Bankruptcy Law Constructive Fraud Counts (Counts 1, 2, 9, 11, 17, and 21)

The Bankruptcy Law Constructive Fraud Counts seek avoidance pursuant to Section

13

548(a)(1)(B) of the Override Agreement and the Amended Override Agreement, transfers made pursuant to those two agreements, the Forbearance Agreement, and the Second Releases. Defendants initially argue that all the Bankruptcy Law Constructive Fraud Counts must be dismissed because the transactions sought to be avoided are protected transactions under the safe harbor provisions of Section 546. Defendants contend that dismissal at this early stage of the case and before discovery is appropriate and necessary to promote the purposes of the safe harbor provisions in creating market stability.[54] In addition to arguing that the safe-harbor laws protect against avoidance of the transactions, Defendants argue that Plaintiff has failed to otherwise state a viable claim for fraudulent conveyance because the payments made to Defendants reduced antecedent debt and further that insolvency is not properly pled.[55]

Section 548(a)(1)(B) sets forth the grounds for avoidance under the bankruptcy laws for constructively fraudulent transfers. It provides:

> (a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an

---

[54] Both parties included as exhibits to their pleadings, declarations, referenced agreements, and communications between the parties. Despite the introduction of evidence into this motion to dismiss, the court does not find that the matter must be treated as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d), applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012. *See Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (holding that on a Rule 12(b)(6) motion the court may take into account documents attached to the complaint as well as authentic documents integral to the complaint that are attached to motion to dismiss); *Bey v. Shapiro Brown & Alt, LLP*, __ F.Supp.2d__ , 2014 WL 661586, at *3 (D. Md. 2014) (exception exists to Rule 12(d) allowing court to consider documents "referenced and relied upon" by Plaintiff in complaint).

[55] Defendants did not argue that Plaintiff failed to state a cause of action with respect to Counts 9, 17, and 21 which were counts brought to avoid the actual agreements (the Amended Override Agreement, the March Forbearance Agreement and the Second Releases) as opposed to the transfers pursuant to those agreements.

insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

. . . .

      (B)    (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

            (ii)    (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

                  (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

                  (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

                  (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

## 1. Safe Harbor Protections

First the court addresses the defense raised under the safe harbor provisions of Section 546.

Defendants argue that as to the Bankruptcy Law Fraudulent Conveyance Counts, any and all

transfers made under the various agreements are protected from the reach of Section 548(a)(1)(B)

by the safe harbors provided under Section 546(e)- (g).

The Section 546 safe harbors provide as follows:

(e) Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

(f) Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer made by or to (or for the benefit of) a repo

participant or financial participant, in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

(g) Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

These safe harbor provisions require that transfers otherwise avoidable as constructively fraudulent under Section 548(a)(1)(B) or state law (applying Section 544)[56] are not subject to avoidance if for example, the transfers qualify as margin payments or settlement payments in connection with a securities contract, are made to or from a repurchase participant in connection with a repurchase agreement or a swap participant in connection with a swap agreement. Accordingly, the issue of whether the agreements between the parties meet the definitions of repurchase agreements, swap agreements or securities contracts is vigorously contested by the parties.

Defendants argue that the agreements between the parties fit squarely within the definitions provided by the Bankruptcy Code and emphasize that case law supports a finding that the safe harbor provisions are to be interpreted broadly. Plaintiff defends against application of the safe harbor provisions by arguing that the swap agreements were never true swap agreements and although at one point in time the original Master Purchase Agreements may have qualified under the Bankruptcy Code's definition of repurchase agreement, the subsequent agreements and transactions between the parties were so contrary to the original agreements that they lost all indicia of being protected transfers. In response to the Plaintiff's argument that the safe harbor provisions would not apply because the original nature of the agreements was transformed by subsequent conduct, Defendants argue both factually that the agreements did not transform and legally that in

---

[56] *See infra* Part IV.B.

16

applying the safe harbor provisions the court need only consider the original agreement and whether it qualifies under the applicable definition.

The court finds that the Bankruptcy Law Constructive Fraud Counts must be dismissed pursuant to Section 546(e), (f) and (g).  Each of the agreements, transfers and parties qualify under one or more of the safe harbor provisions.

Case law is replete with descriptions of the purpose of the safe harbor provisions in promoting stability in the financial markets.  *See e.g., In re National Gas Distributors, LLC,* 556 F.3d 247, 252-53 (4th Cir. 2009); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d 846, 849 (10th Cir. 1990) (quoting H.R. Rep. 97-420, at 2 (1982).  In furtherance of this stated purpose of protecting markets as opposed to merely certain agreements, Congress provided in Section 546(e)-(g) broad, inclusive provisions describing the protected transactions and the definitions of certain terms provided in the safe harbor provisions are defined in Section 101 and are themselves expansive.[57]

In their Motion to Dismiss, Defendants contend that all subject transfers were made by or to each Defendant and that each of them meets the definition of either "repo participant" or "swap participant" as required in assuming the safe harbor protections of Section 546(f) and (g).  Those terms are defined in Sections 101(46)[58] and 101(53C),[59] respectively.   Defendants further assert that each would qualify also as a "financial participant" under Section 546(e), as that term is defined by

---

[57] *E.g., In re National Gas Distributors, LLC*, 556 F.3d at 253-54 (discussing the expansion of the definition of swap agreements and swap participants).

[58] Section 101(46) provides: "the term 'repo participant' means an entity that, at any time before the filing of the petition, has an outstanding repurchase agreement with the debtor."

[59] Section 101(53C) provides: "the term 'swap participant' means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."

17

Section 101(22A).[60] Thus, Defendants contend they each qualify for safe harbor protections under more than one subsection of Section 546. The Amended Complaint supports this conclusion. Each Defendant is alleged in the Amended Complaint to have been party to a master repurchase agreement and party to the International Swaps and Derivatives Association ("ISDA") Master Agreement with Debtor prior to the petition and the value of the market positions is alleged to exceed the requirements of Section 101(22A) in determining what parties may qualify as financial participants. Accordingly, each of the transfers was "to (or for the benefit of)" a protected party.

Having found that each of the Defendants qualifies under the definition of the types of entities intended to be protected by the safe harbor provisions, the court turns to the determination of whether each of the transfers was the type of payment specified or was made in connection with the type of contract included within the safe harbor provisions. Defendants argue that each transfer qualifies and was "in connection with" a repurchase agreement (Section 546(f)), a swap agreement (Section 546(g)), or a securities contract (Section 546(e)).

As to the payments made pursuant to the Override Agreement on account of and to

---

[60] Section 101(22A) provides:
The term "financial participant" means—
(A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561 (a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or
(B) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

Defendants holding debt arising from repurchase transactions referred to in the Amended Complaint,[61] the court finds that such payments constitute transfers that were margin payments,[62] as defined in Sections 101, 741, or 761, or settlement payments, as defined in Sections 101 or 741 made to or for the benefit of financial participants.  Further, the court finds that the challenged payments were transfers to or for the benefit of financial participants or financial institutions in connection with a securities contract as defined in Section 741(7).

Section 101(47) (in applicable part) provides the definition of "repurchase agreement" (and reverse repurchase agreements) as follows:

> (A)    (i)[A]n agreement, including related terms, which provides for the transfer of one or more certificates of deposit, mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans, eligible bankers' acceptances, qualified foreign government securities (defined as a security that is a direct obligation of, or that is fully guaranteed by, the central government of a member of the Organization for Economic Cooperation and Development), or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposit, eligible bankers' acceptances, securities, mortgage loans, or interests, with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptance, securities, mortgage loans, or interests of the kind described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds;
>> (ii) any combination of agreements or transactions referred to in clauses (I) and (iii);
>> (iii) an option to enter into an agreement or transaction referred to in clause (i) or (ii);
>> (iv) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), or (iii), together with all supplements to any such master agreement, without regard to whether such master agreement provides for an agreement or transaction that is not a repurchase agreement under this paragraph, except that such master agreement shall be considered to be a

---

[61] *See* ¶¶ 3.0 and 3.5 of the Amended Override Agreement.

[62] The court makes no finding as to the Plaintiff's allegations that the margin calls were improperly made or coercive.

> repurchase agreement under this paragraph only with respect to each
> agreement or transaction under the master agreement that is referred to in
> clause (i), (ii), or (iii); or
> (v) any security agreement or arrangement or other credit enhancement
> related to any agreement or transaction referred to in clause (i), (ii), (iii), or
> (iv), including any guarantee or reimbursement obligation by or to a repo
> participant or financial participant in connection with any agreement or
> transaction referred to in any such clause, but not to exceed the damages in
> connection with any such agreement or transaction, measured in accordance
> with section 562 of this title; and
> (B) does not include a repurchase obligation under a participation in a commercial
> mortgage loan.

In *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S & L Ass'n.*, 878 F.2d 742 (3d Cir.

1989), the United States Court of Appeals for the Third Circuit described a two part inquiry as to

whether an agreement was a standard repurchase or reverse-repurchase agreement under the Section

101 definition.  The court wrote:

> A standard repurchase agreement, commonly called a "repo," consists of a two-part
> transaction. The first part is the transfer of specified securities by one party, the
> dealer, to another party, the purchaser, in exchange for cash. The second part
> consists of a contemporaneous agreement by the dealer to repurchase the securities
> at the original price, plus an agreed upon additional amount on a specified future
> date. A "reverse repo" is the identical transaction viewed from the perspective of the
> dealer who purchases securities with an agreement to resell.

*Id.* at 743.  *See also American Home Mortgage Inv. Corp. v. Lehman Bros. Inc. (In re American

Home Mortgage, Holdings, Inc.*, 388 B.R. 69, 77-78 (Bankr. D. Del. 2008).   Applying this *Bevill*

analysis, the court finds that the Master Repurchase Agreements entered into between Debtors and

Defendants herein created repurchase and reverse-repurchase agreements as contemplated under the

bankruptcy safe harbor protections.[63]  The MBS transferred under the agreements between Debtors

---

[63] Moreover, the agreements themselves provide language such as:
The parties recognize that each Transaction is a "repurchase agreement' as that
term is defined in Section 101 of Title 11 of the United States Code, as amended
(except insofar as the type of Securities subject to such Transaction or the term of
such Transaction would render such definition inapplicable), and a "securities

and Defendants qualify as "interests in mortgage related securities or mortgage loans" as set forth in

Section 101(47)(A). *See American Home Mortgage*, 388 B.R. at 81-82. Second, the original

agreements at issue in this case provide for the contemporaneous exchange of the MBS and an

agreement to repurchase such.[64]

Plaintiff does not contend that the Master Repurchase Agreements were not repurchase

agreements as described by the bankruptcy statute. However, Plaintiff argues that the subsequent

agreements between the parties transformed the initial agreements in such a way as to remove them

from the definition of repurchase agreements, thus eliminating the safe harbor protections. For

example, citing Section 101(47) and the requirement that repurchase transaction be completed not

later than a year from the purchase date, Plaintiff points to the sections in the Override Agreement,

Amended Override Agreement and March Forbearance Agreements which extended the maturity

dates beyond the one-year date set forth in the original agreements.[65] Although the court declines to

hold where it is not necessary that an agreement can never be transformed by subsequent

amendments so as to remove them from the definitions provided for in the safe harbors, such is not

---

contract" as that term is defined in Section 741 of Title 11 of the United States
Code, as amended (except insofar as the type of assets subject to such Transaction
would render such definition inapplicable).
Declaration of Douglas K. Mayer in Support of Defendants' Joint Motion to Dismiss, Exhibit A
(Credit Suisse Repurchase Agreement) § 19(a).

[64] The court also finds that the repurchase agreements qualify under the definition of
securities contracts. *See* Section 741(7).

[65] *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Joint Motion to
Dismiss First Amended Complaint, at pp. 42-44.
Plaintiff also contends that the MBS were transformed to non-protected agreements upon
their downgrade from AAA and AA ratings. This argument fails primarily because of the
court's holding that the agreements also meet the definition of the repurchase agreements by
virtue of being "interests in mortgage related securities or mortgage loans" which definition does
not depend on a rating to qualify.

the result here.  The conduct of the parties and additional agreements entered into as part of the forbearance process did not remove the numerous indicia of these agreements which qualify as safe-harbored agreements under separate and numerous definitions under the Bankruptcy Code.

Ultimately, because the court finds the original agreements to be repurchase agreements and finds a solid nexus between the workout agreements and the original agreements, each of the challenged transfers meets the definition and intention of being "in connection with" a repurchase agreement.  *See Securities Inv. Protection Corp. v. Bernard L. Madoff Inv. Securities, LLC (In re Madoff)*, 505 B.R. 135, 144 (S.D.N.Y. 2013) (finding the language "in connection with" in Section 546(g) should be given a broad interpretation of being "related to such an agreement.").

Plaintiff does not renew the transformation argument with respect to the swap agreements with Defendants RBS PLC, Greenwich Capital and CSI , but instead argues that the swap agreements (and reverse swap agreements) never met the definition provided in the Bankruptcy Code and were merely "naked guarantees meant to push guarantee liability back to Debtors."

Section 101(53B) sets forth the definition:

The term "swap agreement"--
    (A) means–
        (i) any agreement, including the terms and conditions incorporated by reference in such agreement, which is–
            (I) an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap;
            (II) a spot, same day-tomorrow, tomorrow-next, forward, or other foreign exchange, precious metals, or other commodity agreement;
            (III) a currency swap, option, future, or forward agreement;
            (IV) an equity index or equity swap, option, future, or forward agreement;
            (V) a debt index or debt swap, option, future, or forward agreement;
            (VI) a total return, credit spread or credit swap, option, future, or forward agreement;

(VII) a commodity index or a commodity swap, option, future, or forward agreement;

(VIII) a weather swap, option, future, or forward agreement;

(IX) an emissions swap, option, future, or forward agreement; or

(X) an inflation swap, option, future, or forward agreement;

(ii) any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph and that--

(I) is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives markets (including terms and conditions incorporated by reference therein); and

(II) is a forward, swap, future, option, or spot transaction on one or more rates, currencies, commodities, equity securities, or other equity instruments, debt securities or other debt instruments, quantitative measures associated with an occurrence, extent of an occurrence, or contingency associated with a financial, commercial, or economic consequence, or economic or financial indices or measures of economic or financial risk or value;

(iii) any combination of agreements or transactions referred to in this subparagraph;

(iv) any option to enter into an agreement or transaction referred to in this subparagraph;

(v) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), or (iv), together with all supplements to any such master agreement, and without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement under this paragraph, except that the master agreement shall be considered to be a swap agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i), (ii), (iii), or (iv); or

(vi) any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in clause (i) through (v), including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and

(B) is applicable for purposes of this title only, and shall not be construed or applied so as to challenge or affect the characterization, definition, or treatment of any swap agreement under any other statute, regulation, or rule, including the Gramm-Leach-Bliley Act, the Legal Certainty for Bank

> Products Act of 2000, the securities laws (as such term is defined in section
> 3(a)(47) of the Securities Exchange Act of 1934) and the Commodity
> Exchange Act.

The definition itself contains broad language ("any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph") as recognized by the Court in *In re National Gas Distributors, LLC*, 556 F.3d at 253. That court explained that "[t]he current definition of 'swap agreement' is now extremely broad, covering several dozen enumerated contracts and transactions, as well as combinations of them, options on them, and similar contracts or transactions." *Id.*

The agreements at issue in this case require cash payments to be exchanged between the parties based upon an index calculation.

> A swap is a bilateral financial transaction where one counterparty "swaps" the cash
> flows of a single asset or basket of assets in exchange for cash flows from the
> counterparty. As a result, a swap allows the party to gain exposure and the upside
> returns from a reference fund without actually having to own it.

*Madoff*, 505 B.R. at 138 fn.1 (citation omitted).

Plaintiff argues that the back-to-back nature of the swap transactions require a finding that they were not true swap agreements and were mere credit support. The court does not find that the Plaintiff's argument is persuasive. The agreements followed the customary ISDA forms and contained the characteristics common with swaps. The Plaintiff's challenge based on his characterization of the purpose of the swaps as credit support does not remove the transactions from the definition provided in the Bankruptcy Code or the protections provided those transactions. Indeed, as held by the *Madoff* court, infusing an analysis of the debtor's intent into the

determination of whether a transaction qualifies for safe harbor[66] frustrates the broad definition provided by Congress.  *Id*. at 144-45.  Accordingly, the court finds that the swap agreements and back end swap agreements are safe-harbored pursuant to Section 546(g).

## 2. Failure to State a Cause of Action

The court further finds that the Bankruptcy Law Constructive Fraud Counts are subject to dismissal based on the Defendants' alternative ground of failure to adequately state a cause of action under Federal Rule of Civil Procedure 12(b)(6),[67] incorporated into this adversary proceeding by Bankruptcy Rule 7012(b).

A motion made pursuant to Rule 12(b)(6) allows a claim to be dismissed for failure to state a claim upon which relief can be granted.  The purpose of a motion under Rule 12(b)(6) is to test the legal sufficiency of the statement of the claim.  *Chertkof v. Baltimore*, 497 F.Supp. 1252, 1258 (D.Md. 1980).  The United States Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007):

> While a complaint attacked by a Rule12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.  Factual allegations must be enough to raise a right to relief above the speculative level. . . .

*Id.* at 545, 127 S.Ct. at 1964-65 (citations omitted).  The Court further elaborated in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) that the review of a complaint upon a motion to dismiss for failure to state a cause of action is "context-specific" and acknowledged that courts must use their "judicial experience and common sense. . . . " *Id.* at 679, 129 S.Ct. at 1950.

---

[66] This is unlike Section 548(a)(1)(A) which allows for avoidance upon a showing of intentional fraud and is not subject to the safe harbor protections.

[67] Hereafter referred to as "Rule 12(b)(6)."

25

Counts 1 and 9 of the Amended Complaint are distinguishable from the other Bankruptcy Constructive Fraud Counts because Plaintiff seeks avoidance of the Override Agreement and Amended Override Agreement (as opposed to the transfers thereunder).  Plaintiff avers that each of the agreements represents an incurrence of obligation that is avoidable under Sections 548(a)(1)(B) and 550 of the Code.  These Counts do not attempt to avoid any particular undertaking by Debtors under the agreements as an obligation for purposes of the application of the avoidance statute but instead attempt to broadly label the entire agreement as "obligations."

Although both "transfers" and "obligations" are expressly avoidable under Section 548, the Bankruptcy Code only provides a definition for "transfers."  The statute reads:

> The term "transfer" means–
> (A) the creation of a lien;
> (B) the retention of title as a security interest;
> (C) the foreclosure of a debtor's equity of redemption; or
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–
>   (i) property; or
>   (ii) an interest in property.

11 U.S.C. § 101(54).  *See also MacMenamin's Grill Ltd. v. Mooney, et al, (In re MacMenamin's Grill Ltd)*, 450 BR. 414, 429 (Bankr. S.D.N.Y. 2011).  The effect of a transfer of a debtor's interest in property is a depletion of the assets of the debtor, where there is no receipt by the debtor of reasonable equivalent value.  The effect of an obligation incurred by a debtor is to increase the liabilities and hence potential claims against the assets of the debtor thus diluting the recovery opportunities of other claims, unless the debtor receives reasonably equivalent value.  The word "obligation" does not apply so broadly as to include any agreement entered into that does neither.

The attempt by Plaintiff to exclude the agreements from the safe harbor provisions and as a remedy, in effect, tear up the Override Agreement and Amended Override Agreement by labeling

26

the whole as an incurrence of an "obligation" as the term appears in Section 548(a)(1)(B) is not supportable under the statute offered by Plaintiff for that purpose. The court finds that the Plaintiff's argument that an entire agreement can be avoided as opposed to specific transfers and obligations therein, fails as a matter of law. The court therefore finds that Counts 1 and 9 are duplicative of Counts 2 and 11 and the safe harbors set forth in Section 546(e)-(f) apply to each and every transfer thereunder.

Furthermore, by Counts 2 and 11 Plaintiff argues that Section 548(a)(1)(B)) requires avoidance of enumerated payments made to the Defendants based on an assertion that due to the Override Agreement Transfers and Amended Override Agreement Transfers Debtors were insolvent, left with insufficient capital, and left without sufficient liquidity to pay debts incurred or intended to be incurred. Plaintiff further avers that Debtors did not receive reasonably equivalent value for the transfers. This last (and legally essential) averment is challenged by Defendants. They argue that the payments made in accordance with the Override Agreement and Amended Override Agreement were on account of antecedent debts and the reduction of those debts by application of the payments received constitutes reasonably equivalent value as a matter of law.

Plaintiff disputes that statement of law, citing *Official Comm. of Unsecured Creditors v. Wachovia Bank (In re Heilig-Meyers Co.)*, 297 B.R. 46, 52 (Bankr. E.D. Va. 2003), and further argues that the margin calls which precipitated the Override Agreement and payments made thereunder were wrongfully demanded by Defendants. Plaintiff does not aver in the Amended Complaint that the payments were not applied to the indebtedness arising from the financing transactions and repayment/repurchase obligations incurred by Debtors. The Plaintiff's assertion of wrongful margin calls appears to allege that the demands for partial pay down or further securitizations were wrongful demands based on the method of valuing the underlying securities

and not diversion of the payments to other than repayment of obligations outstanding. The court finds that to the extent the transfers asserted to be avoidable under Section 548(a)(1)(B) as constructive fraudulent transfers reduced debts owed by Debtors under the various financing arrangements preexisting the Override Agreement, the constructive fraud counts would fail even if not protected by the safe harbor provisions.

In summary, the court finds that all Bankruptcy Law Constructive Fraud Counts must be dismissed because each and every transfer alleged in these counts is protected by the safe harbor protections of Section 546(e)-(g) and further as to Counts 1, 2, 9 and 11, that they fail to state a cause of action.

**B. State Law Constructive Fraud Counts (Counts 4, 5, 13, 15, 19, and 23)**

Defendants seek dismissal of the State Law Constructive Fraud Counts based on the safe harbor provisions of Section 546 and for a failure to state a cause of action as to Counts 4, 5, and 15. The court's analysis regarding the applicability of the safe harbor provisions to the Bankruptcy Law Constructive Fraud Counts[68] applies equally to the State Law Constructive Fraud Counts. The express language: "Notwithstanding section[] 544. . . the trustee may not avoid. . ." contained in each part of Sections 546(e)-(g) evidences the congressional intent to exclude from the avoidance provisions any transfers found to be constructively fraudulent based on state law. Similarly, the court's conclusion that to the extent that indebtedness was reduced by the application of the proceeds, the transfer would not be avoidable as a constructive fraudulent conveyance[69] is the

---

[68] *See supra* Part IV.A.1.

[69] *See supra* Part IV.A.2.

same as to the parallel counts brought by Plaintiff under the State Law Constructive Fraud Counts.

Accordingly, Counts 4, 5, 13, 15, 19 and 23 will be dismissed.

## C. Bankruptcy Law Actual Fraud Counts (Counts 3, 8, 10, 16, and 20)

Because Section 546 does not provide a safe harbor from transactions otherwise avoidable

under Section 548 due to actual fraud, the grounds for dismissal raised by Defendants for the

Bankruptcy Law Actual Fraud Counts are based solely on their contention that Plaintiff has failed to

allege the requisite fraudulent intent and the lack of requisite badges of fraud.

Section 548(a)(1)(A) sets forth the grounds for avoidance of a transfer[70] by actual fraud. It

provides:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit
> of an insider under an employment contract) of an interest of the debtor in property,
> or any obligation (including any obligation to or for the benefit of an insider under
> an employment contract) incurred by the debtor, that was made or incurred on or
> within 2 years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily-
>> (A) made such transfer or incurred such obligation with actual intent to
>> hinder, delay, or defraud any entity to which the debtor was or became, on or
>> after the date that such transfer was made or such obligation was incurred,
>> indebted. . . .

For each count brought pursuant to Section 548(a)(1)(A) in the Amended Complaint,

Plaintiff states that the transfers were made with an actual intent to hinder, delay and/or defraud the

Debtors' creditors and that the intent can be "inferred from, among other things, the traditional

badges of fraud surrounding the Debtors' entry into the [Agreement]."  Plaintiff alleges that

Defendants caused Debtors to enter into the underlying transactions and effectuate the transfers and

---

[70] A "transfer" is defined in the U.S. Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." 11 U.S.C. § 101(41).

that Defendants exercised dominance or control over Debtors to the detriment of the Debtors' other creditors.

Defendants argue that the court must dismiss the actual fraud counts because the Plaintiff's use of imputation of intent to defraud is not adequately pled because it fails to rise to the level of control necessary to meet the dismissal standard.  The court disagrees.  The Amended Complaint contains repeated allegations that Defendants individually and collectively dominated and controlled the Debtors' resources and disposition of assets. The court finds that with the exception of Count 8,[71] the Amended Complaint alleges with requisite specificity the challenged transfers, dates of the transfers, and the requisite intent.  The Amended Complaint has met the standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 544, 127 S.Ct. at 1955 and Federal Rule of Civil Procedure 9(b) ("Rule 9(b)).  In so determining, the court recognizes cases such as *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 581 (Bankr. S.D.N.Y. 1999) wherein the court held that where the plaintiff is a third party trustee and an outsider to the alleged fraudulent transactions, the Rule 9(b) standard should be applied more liberally.

## D. State Law Actual Fraud Counts (Counts 6, 12, 14, 18, and 22)

Defendants seek dismissal of the five State Law Actual Fraud Counts based upon their argument that the safe harbor provisions extend even to actual fraud counts brought under State law by Section 544(b) and that only avoidance actions based on actual fraud brought pursuant to Section 548(a)(1)(A) are excluded from the safe harbor protections.  Defendants further argue that the State Law Actual Fraud Counts should be dismissed because Plaintiff has failed to sufficiently allege the requisite fraudulent intent and badges of fraud.

---

[71] Count 8 (Avoidance of the Amended Override Agreement) must be dismissed on the same grounds enunciated as to Count 1.  *See supra* Part IV.A.B.

The court agrees with the Defendants' argument that the safe harbors in Section 546 prevent avoidance actions based on state law actual fraud claims. The plain language of the Section 546(e)-(g) safe harbors include actions brought pursuant to Section 544.[72] Therefore, having found that the safe harbors protect the transfers complained of in the Amended Complaint, Counts 6, 12, 14, 18 and 22 are dismissed.

## E. The Preference Counts (Counts 24, 25, and 26)

In Count 24, Plaintiff seeks to avoid as preferential transfers, payments made to named defendants within one year prior to the Petition Date pursuant to Section 547. Plaintiff alleges that these transfers, listed in paragraph 406 of Amended Complaint, were made pursuant to the terms of the Override Agreement. Plaintiff alleges that because the recipient Defendants were insiders of the Debtors as defined in Section 101(31), the transfers that occurred outside the 90-day period immediately prior to the Petition Date are also avoidable. Similarly in Counts 25 and 26, Plaintiff seeks to avoid transfers made pursuant to the Amended Override Agreement (Count 25) and the Second Releases (Count 26) upon the same asserted application of Section 547.

In the Motion to Dismiss Defendants argue that these preference avoidance counts must be dismissed by reason of the application of any of several stated defenses. Defendants assert that the complained of transfers are protected against avoidance by the safe harbor provisions under Section 546. In addition, Defendants state that the facts asserted in the Amended Complaint fail to state a claim because the pleaded facts are insufficient to support a finding that the Defendants were

---

[72] *See, e.g., In re Tronox Inc.*, 503 B.R. 239, 338 fn 131 (Bankr. S.D.N.Y. 2013) ("Inexplicably, although the section explicitly exempts intentional fraudulent conveyances under Section 548(a)(1)(A) of the Bankruptcy Code, it does not exempt the same conveyance under State law, which can generally be avoided in a bankruptcy cases only through application of Section 544(b) of the Bankruptcy Code.").

insiders of the Debtors at the time of the transfer.   Defendants also argue that the Amended

Complaint fails to allege facts that would satisfy the requirements of Section 547(b)(5).[73]

As to the Defendants' arguments concerning the allegation of insider and of improvement of

position under Section 547(b)(5), the court would deny the Defendants' motion.  However, for the

same reasons explained above,[74] the court finds that the transfers are protected from avoidance by

Plaintiff by the safe harbor provisions of Section 546.  Accordingly, Counts 24, 25 and 26 will be

dismissed.

### F. The Override Breach Counts (Count 7)

Count 7 is the Plaintiff's cause of action for breach of the Override Agreement.  The pleaded

facts include allegations that Defendants breached agreements contained in the Override Agreement

to remit 80% of interest from the MBS and instead impounded 100% of those funds for their own

benefit.

Defendants, in the Motion to Dismiss, argue that this court must dismiss this count as a

matter of law based upon releases contained in the subsequently executed Amended Override

Agreement, March Forbearance Agreements and a Termination and Purchase Agreement.

Defendants also argue that Count 7 is barred by the alleged ratification by TMST arising from its

---

[73] Section 547(b)(5) provides:
Except as provided in subsections (c) and (i) of this section, the trustee may avoid
any transfer of an interest of the debtor in property—
    (5) that enables such creditor to receive more than such creditor would
    receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent
        provided by the provisions of this title.

[74] *See supra* Parts IV.A.1, B and D.

execution of the Amended Override Agreement, that TMST waived any asserted cause of action for breach, and that any such action is barred as a result of the court's February 22, 2012 ruling in Credit Suisse Securities (USA) LLC v. TMST, Inc. (f/k/a Thornburg Mortgage, Inc.), et al, Adversary Proceeding Case No. 09-574.

The Amended Override Agreement and some of the Forbearance Agreements contain general releases which if enforceable would bar the Plaintiff's action for breach of the Override Agreement. However, in Counts 10 and 16, Plaintiff seeks to avoid transfers that occurred under the Amended Override Agreement and the Forbearance Agreements upon an allegation that those agreements were the result of actual fraud. Releases of a cause of action can effectuate a transfer of the cause of action to the benefit of the released party. Thus, if Plaintiff succeeds in proving his actual fraud based avoidance, the releases will not be enforceable.

In addition, the Plaintiff's allegations include assertions that Defendants acted in bad faith and with intent to destroy TMST. If the agreements containing the releases were entered into by Defendants with the actual intent (of Defendants) to not fulfill obligations imposed upon the Defendants, such may invalidate the releases as having been obtained through fraudulent misrepresentation.

The court finds that collateral estoppel does not bar this Count. The ruling to which Defendants cite was not upon the same issue but rather was made in the context of a challenge to the security interests of the defendant therein. For these reasons Count 7 will not be dismissed.

## G. The Breach of Repurchase Agreements Count (Count 27)

Similar to the Plaintiff's stated cause of action in Count 7, Count 27 alleges breach of agreement. Under Count 27, the alleged breached agreements are Repurchase Agreements and the Forbearance Agreements. The Amended Complaint alleges that Defendants wrongfully valued the

33

repurchase collateral when liquidating the collateral and crediting the collateral value to the loan obligations.  Citing Sections 559 and 562 of the Bankruptcy Code, Plaintiff asserts that any excess value over the repurchase obligations (when calculation of the value is in accordance with the governing agreement) must be turned over to the bankruptcy estate.  Plaintiff further asserts that the Defendants' wrongful valuation damaged Debtors.

In the Motion to Dismiss, Defendants argue that Plaintiff fails to plead facts demonstrating breach of the method of valuation set forth in the agreements and instead asserts only bald conclusions.  Pointing to the agreements, Defendants assert that the documents specifically authorize the liquidation of the collateral, and in some agreements, a valuation in the "sole discretion" of the lending party.  However the court must disagree with the Defendants' characterization of Count 27 of the Complaint as to the sufficiency of the facts asserted.  The Amended Complaint includes sufficient detail as to the alleged rights of Debtors to a reasonable exercise of the "sole discretion" as to valuation and an allegation that such a reasonable valuation would have yielded excesses in amounts over those which were credited.  Nor does a review of the cited agreements defeat the Plaintiff's theory of law.  At this stage of the adversary proceeding, Count 27 is sufficient in pleaded fact and legal basis to survive the Defendants' Motion to Dismiss.[75]

## H. The Duress Count (Count 28)

Plaintiff seeks to invalidate and render unenforceable the Override Agreement, Amended Override Agreement, First Releases, March Forbearance Agreement, Second Releases, (the "Challenged Agreements") and the obligations and transfers related thereto and to rescind the

---

[75] For the reasons stated in Part V of this Memorandum, Count 27 will be dismissed as to Defendant Citigroup Global Markets, LTD.

Override Agreement, Amended Override Agreement, and March Forbearance Agreements because of coercion or duress. Defendants seek dismissal of this count asserting that the Amended Complaint fails to plead facts which form a plausible basis for the requested relief.

The elements of duress or coercion applicable to this count are uncontested. Defendants must have made a threat to do an unlawful injury resulting in Debtors being compelled or forced to agree to a contract or release. The wrongful threat must have precluded the Debtors from exercising free will. *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 2010 WL 1257300, at *6 (S.D.N.Y. March 31, 2010). The exercise of legal rights by a party or rights asserted under a good faith interpretation of a contract do not support a finding of abuse or coercion. *See Cooper Dev. Co. v. Friedman*, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994). Here, Defendants argue that the facts pled by Plaintiff are solely exercises by Defendants of their rights under the Challenged Agreements.

However, the Defendants' characterization of the pleaded facts as reciting only lawful exercise of contractual rights is inaccurate. The Amended Complaint specifically asserts that after TMST's issuance of a 10-K report in March of 2008, Defendants improperly made inflated margin calls for more than $600 Million. These allegedly unlawful calls were made at a time during which Defendants knew that TMST had a liquidity crisis.[76] The Amended Complaint further pleads that in some instances the repurchase agreements instead entitled TMST to receive reverse margin calls. By inference the allegedly improper calls threatened liquidation of the underlying collateral causing economic duress. The factual allegations state that these alleged unlawful acts placed Debtors into

---

[76] *See* Amended Complaint at ¶¶ 46-50.

such severe economic distress as to leave Debtors no viable choice other than to agree to the demands contained in the Override Agreement.

Defendants contest the Plaintiff's assertions that Debtors had no free will, pointing to alternatives such as a suit by Debtors to enforce the repurchase agreements, or an earlier bankruptcy filing. However, free will is precluded if irreparable harm would be suffered should the threat be carried out and circumstances permit no other alternative to the agreement. *See KiSKA Const. Corp. US v G & G Steel, Inc.*, 2005 WL 1225944, at *4-5 (S.D.N.Y. May 20, 2005). At this stage of this litigation, the court has no basis in fact to determine whether the economic distress alleged to have resulted from the alleged improper margin calls could have been adequately remedied by either litigation or an earlier bankruptcy filing.

Similarly, Plaintiff asserts that Defendants wrongfully breached the Override Agreement and caused continuing economic duress leading to Debtors' entry into the Amended Override Agreement[77] by which a significant amount of TMST's value was obtained by payout of a large portion of the liquidity fund to Defendants**.**

Defendants also point to applicable New York law requiring a timely repudiation of an agreement obtained by duress. However, as argued by Plaintiff, continuing duress delays the requirement of repudiation. *See Sosnoff v. Carter*, 165 A.D.2d 486, 492 (N.Y. App. Div. 1991). The facts alleged by Plaintiff rise to a plausible basis (when viewed most favorably to Plaintiff) that such continuing economic duress may have existed as a result of the continuing alleged wrongful

---

[77] *See* Amended Complaint at ¶ 100.

acts and demands by Defendants.  Thus, the court concludes that the Amended Complaint should

not be dismissed as to Count 28.[78]

## I. Equitable Subordination Count (Count 29)

In Count 29 Plaintiff requests that the court order the claims of Defendants be subordinated

to all other allowed claims based upon equity as authorized by Section 510(c).[79]  Defendants argue

that the Equitable Subordination Count must fail because that the facts stated in the Amended

Complaint cannot support the remedy of equitable subordination, applying the plausibility standard

of *Bell Atlantic v. Twombly,* 550 U.S. at 544, 127 S.Ct. at 1955.

> A bankruptcy court's "general equitable power to adjust equities among creditors in
> relation to the liquidation results" is the source of the bankruptcy court's power to
> subordinate claims.  The equitable goal is to prevent injustice or unfairness in the
> bankruptcy context.  This is accomplished by permitting the court to subordinate an
> otherwise legally valid claim when the claimant has engaged in conduct that makes it
> unjust or unfair for the claimant to share pro rata with similarly situated creditors.

*Official Committee of Unsecured Creditors of Sunbeam Corporation, et. al. v. Morgan Stanley &*

*Co., Inc., et. al (In re Sunbeam Corp)., 248 B.R. 355, 363 (Bankr. S.D.N.Y. 2002) (*quoting *In* re 80

---

[78] Defendants point out that repudiation of agreements upon a theory of economic duress
is only available in extreme or extraordinary circumstances.  This high standard may place a
weighty burden upon Plaintiff at trial.

[79]  Section 510(c) provides:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing,
the court may—
    (1) under principles of equitable subordination, subordinate for purposes
    of distribution all or part of an allowed claim to all or part of another
    allowed claim or all or part of an allowed interest to all or part of another
    allowed interest; or
    (2) order that any lien securing such a subordinated claim be transferred to
    the estate.

*Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 n.3

(Bankr. S.D.N.Y. 1994)).

[T]he fundamental aim of equitable subordination is to undo or offset any inequity in the

claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the

bankruptcy results. *9281 Shore Road Owners Corp. v. Seminole Realty Co. (9281 Shore Road*

*Owners Corp.)*, 187 B.R. 837, 853 (E.D.N.Y. 1995) (quoting *In re Kansas City Journal-Post Co.,*

144 F.2d 791,800 (8th Cir. 1944). While Congress did not define inequitable conduct in the context

of Section 510(c), courts have developed three requirements for the application of equitable

subordination:

> (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct
> resulted in injury to other creditors and conferred an unfair advantage on the
> claimant; and (3) equitable subordination of the claim is not inconsistent with the
> provisions of the Bankruptcy Code.

*The Bank of New York v. Epic Resorts- Palm Springs MarquisVillas, LLC, et al. (In re Epic Capital*

*Corp.)*, 307 B.R. 767, 772 (D.Del. 2004) (citations omitted).

Furthermore, courts uniformly hold that a higher burden of proof is required of the party

seeking equitable subordination if the respondent is not an insider of the debtor. As to a non-

insider, the plaintiff must show that the defendant engaged in egregious conduct, such as fraud,

spoilation or overreaching. *Id*. In the instant case Plaintiff argues that the facts pleaded in the

Amended Complaint demonstrate that Defendants were insiders of the Debtors. In the alternative

Plaintiff asserts that even if not found to be insiders, the alleged conduct of Defendants rises to the

level of egregious conduct and therefore justifies equitable subordination.

The definition of an insider set forth in Section 101(31) includes "a person in control of the

debtor." 11 U.S.C. § 101(31)(B)(iii). The definition defines by example and as such is not an

38

exclusive listing of the circumstances under which the insider status is to be applied.[80]   "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."  *9281 Shore Road Owners Corp.*, 187 B.R. at 853 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 311–314 (1977)).

However, where a finding of insider status is sought based upon alleged control of the debtor by the defendant, mere pressure or influence upon the debtor is insufficient.  *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 732 (D.Md. 1989).  Instead,

> [i]n order for a creditor to "control" a debtor so as to be considered an "insider," the creditor must be so powerful that the debtor becomes a mere instrument or agent of the creditor, unable to make independent policy and personnel decisions.  The mere exercise by a lender of financial control over a debtor incident to the debtor-creditor relationship does not make the lender an insider.

*LW-SP2, L.P. v. Krisch Realty Assocs., L.P. (In re Krisch Realty Assocs., L.P.)*, 174 B.R. 914, 920 (Bankr. W.D.Va. 1994) (citations omitted).

It may be difficult for Plaintiff to prove by evidence either the degree of control necessary for a finding that Defendants were insiders, or absent such a finding, to prove that the Defendants' conduct was sufficiently egregious to shock the conscience of the court.  Nonetheless, the court, in determining whether to dismiss this count, must look to the pleaded facts, giving all reasonable inferences that might be drawn from those facts in favor of Plaintiff.  Plaintiff pleads a series of events that could be described as wrongful acts by Defendants that placed Debtors in serious financial peril.  If wrongful  margin calls placed Debtors in perilous straits, the Plaintiff's pleaded facts then paint a picture of duplicitous deal-making by Defendants that resulted in the remaining investment value of Debtor being liquidated through the raising of new equity to pay down the

---

[80] *See* 11 U.S.C. § 102(3) ("In this title... 'includes' and 'including' are not limiting").

debts of Defendants.  When coupled with the alleged subsequent breaches by Defendants of the

forbearances promised, the permissible inferences are certainly sufficient to plausibly raise a basis

for equitable subordination.  Certainly such inferences include that the value remaining in TMST

for other creditors was significantly diminished by the Defendant's taking of the liquidity fund.  In

denying the Motion to Dismiss as to this count, the court again cautions that the burden upon

Plaintiff is significant as to proof of the level of misconduct that would justify the extraordinary

remedy of equitable subordination.

## J. Equitable Disallowance Count (Count 30)

In Count 30, Plaintiff requests that the claims of Defendants be disallowed on equitable

grounds.  The Motion to Dismiss argues that equitable disallowance of a claim is not authorized by

the Bankruptcy Code and therefore the court must dismiss this count as a matter of law.

Section 502 provides that a claim for which a proof of claim is properly filed shall be

allowed unless an objection is filed and one of the specific grounds enumerated in Section 502(b)

apply to the claim.[81]  No subsection of Section 502(b) provides expressly for disallowing a claim

based upon inequitable conduct of the claimant.  Subsection (b)(1) provides an exception to

allowance if "such claim is unenforceable against the debtor and property of the debtor, under any

---

[81] Section 502 sets forth (in relevant part):
(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that- . . . .

agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).

Courts addressing equitable disallowance in written opinions have reached conflicting decisions as to whether the court may disallow a claim upon such basis.  In *Adelphia Communications Corp., et al. v. Bank of America, N.A., et al. (In re Adelphia Communications Corp.)*, 365 B.R. 24, 72-75 (Bankr. S.D.N.Y.) (Gerber, J.), the court denied a motion to dismiss concluding that equitable disallowance is permissible under the Bankruptcy Code.  The court found that Section 502 was silent and neither authorized or prohibited equitable disallowance.  Further, the court noted that Section 510(c) which provides for equitable subordination was also silent as to equitable disallowance.  *Id.* at 71.  Upon finding that the Bankruptcy Code was silent as to disallowance of a  claim based upon equitable disallowance, the court turned to historical law.  The court concluded that equitable disallowance was an available remedy under the Bankruptcy Act of 1898 under the ruling in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238 (1939) and that in the Bankruptcy Code, Congress had not indicated specific intent to change that judicially created concept.

To the contrary the same court, in the more recent case of *Harbinger Capital Partners LLC, et. al. v Ergen, et. al. (In re LightSquared., Inc)*, 504 B.R. 321, 342-44 (Bankr. S.D.N.Y.2013) (Chapman, J.), concluded that equitable disallowance is not a permitted basis for disallowing a claim.  This court has neither been apprised of nor found any binding precedent upon this issue in an opinion of either the United States Court of Appeals for the Fourth Circuit or the United States Supreme Court.

While acknowledging the different views of learned judges on the issue, this court concludes that the analysis in the *LightSquare*d opinion is correct and that analysis is adopted herein.  Without

limitation of that adoption, this court finds that it is Section 502, not Section 510, that provides the

statutory law as to allowance and disallowance of claims.  Under Section 502, properly filed claims

(and in Chapter 11 cases scheduled claims that are not scheduled as disputed, contingent or

unliquidated)[82] are allowed unless objected to and one of the specific bases for disallowance listed

in Section 502(b) applies.  As acknowledged in *Adelphia*, there is no provision for equitable

disallowance.

> Equitable disallowance is not one of the specified exceptions to the allowance of a
> claim articulated in section 502(b) or any other subsection of section 502.  There is
> no catch-all "equities" exception, nor any language directing the court to inquire into
> the good faith of the claimant or, more broadly, to consider the interests of justice.

*LightSquared*, 504 B.R. at 336 (footnote omitted) (citing 11 U.S.C. §§ 1129(a)(3), 1126(e) and 28

U.S.C. § 1412).

Section 510(c) does not add to the permissible grounds for disallowance.  It provides that

the court may subordinate an allowed claim under principles of equitable subordination.[83]  It makes

no mention of disallowance.  The *LightSquared* opinion also examines closely the reliance by the

court in *Adelphia* upon the *Pepper v. Litton* precedent.  The *LightSquared* court notes that in *Pepper*

*v. Litton*:

> Relying on the District Court's findings that Litton had executed a "general
> fraudulent plan" to use his long-dormant claims to impair the rights of a valid
> creditor from recovering from the debtor corporation, the Supreme Court upheld the
> disallowance of Litton's claim.  Although *Pepper* generally refers to "disallowance"
> and "subordination" interchangeably, as if they were the same remedy, it identifies
> disallowance as the appropriate remedy for claims that "are fictitious or a sham."
> Thus, the Supreme Court's holding in *Pepper* did not directly address whether such a
> remedy exists with respect to a claim that has a valid basis under applicable law but
> against which a party brings an equitable attack.

---

[82] *See* 11 U.S.C. § 1111(a).

[83] *See supra* note 79.

*LightSquared*, 504 B.R. at 337 (quoting *Pepper v. Litton*, 308 U.S. at 310-12, 60 S.Ct. at 238).  The court added by footnote:

> Under the Code, there is a remedy at law (disallowance pursuant to section 502(b)(1)) that could be invoked in response to a fictitious claim by a fiduciary based on total disregard of the corporate entity. In other words, putting aside the res judicata issues involved in *Pepper*, Litton's claim would be disallowed today pursuant to section 502(b)(1), without resort to equitable disallowance.

*Id.* at 337 n.20.

The Supreme Court has made it clear that bankruptcy courts cannot rely upon equitable powers to reach results not consistent with the provisions of the Code.  *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963 (1988).  This precept is reiterated by the Supreme Court in the recent decision in *Law v. Siegel*, ___ U.S. ___, 134 S.Ct. 1188 (2014).  In that case, the trustee sought to surcharge a debtor's exemption due to debtor's misconduct.  In reversing the lower court's granting of the surcharge, the Supreme Court quoted from the *Ahlers* opinion: "We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code."  *Id.* at __, 134 S.Ct. at 1195 (*quoting Ahlers*, 485 U.S. at 206; 108 S.Ct. at 969).

Although acknowledging that the bankruptcy court may have inherent power to sanction "abusive litigation practices," neither that power nor Section 105 permits the court to override explicit mandates in other sections of the Bankruptcy Code.  In addition to remarking that the Bankruptcy Code provided specific "not to say mind-numbingly detailed- enumeration of exemptions and exceptions to those exemptions. . . ," the Supreme Court found that courts were not allowed to create additional exceptions.

Like the exceptions to exemptions discussed in *Siegel,* In Section 502(b) the Code provides specific grounds for disallowance of claims that do not include equitable disallowance.  Here also

the court may not add to listed  grounds where the statute makes clear that the list is exclusive and not merely examples. Accordingly, Count 30 of the Amended Complaint must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## K. Disallowance Pending Turnover Count (Count 31)

In Count 31 Plaintiff requests that the court disallow the Defendants' claims in the bankruptcy case pursuant to Section 502(d).[84]  Claim disallowance based on Section 502(d) is dependant upon a finding by the court that property is recoverable from the Defendants or transfers to Defendants are avoided under Sections 540, 544, 547, 548 or 550.  Defendants seek dismissal of this count averring that their Motion to Dismiss should be granted as to all counts seeking recovery of property or avoidance of transfers and therefore no basis exists to disallow their claims under Section 502(d).

Because the court has not dismissed all avoidance counts as urged by Defendants, the count states a plausible cause of action for recovery and dismissal of Count 31 must be denied.

## V. Motion to Dismiss by Citigroup Defendants

In addition to participating as co-movants in the Motion to Dismiss, defendants Citigroup Global Inc. and Citi Global LTD, filed a Supplemental Memorandum applicable to only those defendants.

---

[84] Section 502(d) provides:
Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522 (f), 522 (h), 544, 545, 547, 548, 549, or 724 (a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522 (i), 542, 543, 550, or 553 of this title.

44

As to Citigroup Global Inc., the Supplemental Memorandum argues that in all the transactions referred to by Plaintiff in the Amended Complaint, Citigroup Global Inc. acted as a named agent for a disclosed principal and therefore it is not legally the actor responsible for the performance or lack thereof.  Plaintiff counters this assertion by pointing out that he has averred that Citigroup Global Inc. was the recipient of certain transfers that Plaintiff now seeks to avoid in certain counts of the Amended Complaint.  Without discovery, Plaintiff argues it cannot be determined whether there is proof that Citigroup Global Inc. should not be held to be an initial transferee as that term is used in determining liability for avoided transfers.

The Court agrees with Plaintiff as to only those counts seeking to avoid transfers which are not being dismissed as to all defendants for the reasons set forth herein before.  Accordingly, in addition to the dismissal of counts as to all Defendants set forth herein above, Counts 7, 27-29 and 31 of the Amended Complaint shall be dismissed as to Citigroup Global Inc. only.

As to Citi Global LTD, the Supplemental Memorandum argues that the Plaintiff's characterizations of the duties placed upon this defendant in the Global Masters Lending Agreement were by the language of that agreement not duties of Citi Global LTD but instead TMST.  Further it is argued that the CGML Forbearance agreement sets forth an agreed upon valuation of the Citi Global LTD  securities which standard the Amended Complaint does not allege Citi Global LTD violated.  Finally the Supplemental Memorandum avers that English law must govern these agreements with Citi Global LTD  and under that applicable law an implied covenant of good faith and fair dealing does not arise.  In his response to the Supplemental Memorandum, Plaintiff makes no argument as to Citi Global LTD's request that Count 27 of the Complaint be dismissed as against it.

For the reasons stated in the Supplemental Memorandum, the court agrees that as to Defendant Citi Global LTD, Count 27 shall be dismissed.

## VI. Conclusion

The court having found that the Amended Complaint should be dismissed in part, an Order effectuating the court's decision will be entered herewith.

cc:    Plaintiff's Counsel
       Defendants' Counsel
       Counsel for the Committee of Unsecured Creditors
       Office of the United States Trustee

**End Of Opinion**