Entered: December 17th, 2019
Signed: December 17th, 2019



**NANCY V. ALQUIST**
**U. S. BANKRUPTCY JUDGE**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| TMST, INC., f/k/a THORNBURG MORTGAGE, INC., *et al.* | * | Case Nos. 09-17787, 17790-17792 NVA |
| Debtors | * | (Jointly Administered Under Case No. 09-17787 NVA) |
| | * | |
| JOEL I. SHER in his capacity as Chapter 11 Trustee for TMST, Inc., f/k/a THORNBURG MORTGAGE, INC., *et al.* | * | |
| | * | |
| | * | |
| Plaintiff | * | Adv. Proc. No. 11-340 NVA |
| v. | * | |
| JPMORGAN CHASE FUNDING, *et al.* | * | |
| Defendants | * | |

### MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING
### DEFENDANTS' MOTION [ECF NO. 423] TO DISMISS
### <u>COUNTS 3, 10, 16, AND 20 OF THE SECOND AMENDED COMPLAINT</u>

In this adversary proceeding, the Trustee seeks to avoid as fraudulent transfers certain agreements entered into between the Debtors and the Defendant Banks (including liability releases given to the Banks) and the transfer of hundreds of millions of dollars paid under certain of these agreements. The Trustee also seeks to disallow claims of the Banks. The Trustee advances two

theories as to why the transfers and obligations are avoidable under § 548(a)(1)(A) of the Bankruptcy Code.[1]

First, the Trustee alleges that the Banks did not comply with contractual obligations, did not comport themselves within appropriate standards, failed to properly value the collateral, improperly dominated and controlled the Debtors, and essentially caused the precipitous decline in the Debtors' fortunes resulting in their bankruptcies. The Trustee maintains that the Banks' actions reduced the Debtors to mere instrumentalities, with no free will, which then acted at the behest of the Banks to make the challenged transfers of monies and releases to the Banks. The Trustee alleges that in these circumstances, the intent and actions *of the Banks* (the transferees) may be imputed to the Debtors (the transferors) for purposes of § 548(a)(1)(A).

Second, the Trustee maintains that the intent and actions *of a single officer/agent* of the Debtors (purportedly acting in his own self-interest) may be imputed to the Debtors and may stand as a separate basis for avoiding the transfers under § 548(a)(1)(A). The parties refer to the Trustee's second theory as one in which the alleged liability is based on the "Debtors' own intent," as opposed to the first theory, in which it is based on the Banks' imputed intent.

Presently before the Court is the Banks' motion to dismiss the counts of the Second Amended Complaint that raise the Trustee's second theory. Specifically, the Banks seek dismissal of counts 3, 10, 16, and 20 "to the extent they address the Debtors' own intent" as attributed to them through the actions of their officer. The Banks maintain that these counts must be dismissed under Rule 12(b)(6) because they fail to state a claim for relief and because the Trustee's

---

[1] The Court notes that in bankruptcy nomenclature, actions under subsection (a)(1)(A) of § 548 are often referred to as actions for "actual fraud" (even though the statute refers to *intent* to hinder, delay, or defraud), while actions under subsection (a)(1)(B) are sometimes characterized as actions for "constructive fraud." In this case, the parties and the Court sometimes employ bankruptcy terminology, discussing whether the Trustee's allegations do or do not amount to "actual fraud," and whether or not the allegations demonstrate that the actors had "fraudulent intent."

allegations are not specific enough under Rule 9(b). The Banks urge that the Trustee does not sufficiently plead intent, that he fails to plead the badges of fraud, and that he fails to meet the standard for imputing an agent's actions or intent in a corporate principal-agent relationship. They also maintain that the Trustee's second theory is fatally inconsistent with his first.

The Court has determined that the Trustee states a plausible claim in counts 3, 10, 16, and 20 of the Second Amended Complaint and that these amended counts may proceed to trial.

## I.   Background

This adversary proceeding was commenced on April 30, 2011 by Joel I. Sher, the chapter 11 trustee (the "Trustee") against certain investment banks[2] (the "Banks") with which the Debtors had pre-petition dealings. Although certain of the claims were already dismissed,[3] the Trustee retains claims against the Banks in the aggregate amount of approximately $1 billion.[4]

---

[2] JPMorgan Chase Funding Inc. (as successor to Bear Stearns Investment Products Inc.), Citigroup Global Markets, Inc., Citigroup Global Markets Limited, Credit Suisse Securities (USA) LLC, Credit Suisse International, and UBS AG (as successor to UBS Securities LLC). NatWest Markets Securities Inc. (f/k/a RBS Securities Inc., f/k/a Greenwich Capital Markets, Inc.), Greenwich Capital Derivatives Inc., and NatWest Markets Plc (f/k/a The Royal Bank of Scotland plc) were defendants in this adversary proceeding but have been dismissed [ECF No. 530].

[3] In a prior order [ECF No. 76], this Court, presided over by Bankruptcy Judge Duncan W. Keir, granted in part and denied in part the Banks' first motion to dismiss. Judge Keir dismissed six bankruptcy law constructive fraud counts (counts 1, 2, 9, 11, 17, and 21); six state law constructive fraud counts (counts 4, 5, 13, 15, 19, and 23); one actual fraud count under bankruptcy law (count 8); five state law fraud counts (counts 6, 12, 14, 18, and 22); three preference counts (counts 24, 25, and 26); and one count for equitable disallowance of claim (count 30). In all, 22 of 31 counts were dismissed. Counts 1, 2, 4–6, 8, 9, 11–15, 17–19, 21–26, and 30 of the Amended Complaint were dismissed as to all Defendants. Counts 7, 27–29, and 31 of the Amended Complaint were dismissed as to Defendant Citigroup Global, Inc. only.

[4] There is some disagreement about the extent to which Judge Keir's ruling on the Banks' prior motion to dismiss is dispositive of the issues in this case. This Court will not reconsider issues dealing with third-party imputation. There is, however, some overlap between the two motions to dismiss and the resolution of them. As the Banks have previously acknowledged, the Trustee sought to avoid a payment of $219 million by the Debtors to the Banks in the Amended Complaint as actually fraudulent *based on the fraud of the Debtors*. The Banks argued in their first motion to dismiss [ECF No. 32] that the $219 million payment was the only allegation that spoke directly to the Debtors' intent under § 548(a)(1)(A), that the Amended Complaint did not contain sufficient allegations that the Debtors intended to hinder, delay, or defraud their creditors, and did not contain sufficient badges of fraud to support an inference of requisite intent. *See* Banks' Memorandum in Support of Joint Motion to Dismiss First Amended Complaint [ECF No. 32-1] at 89–90, 96–98. This did not change from the Amended Complaint to the Second Amended Complaint. As to whether the intent of the Debtors has been properly pleaded, and whether there were sufficient facts in the Amended Complaint from which Mr. Goldstone's actions in transferring $219 million to the Banks could be imputed to the Debtors, these were implicitly found in favor of the Trustee by Judge Keir's refusal to

The Trustee amended his original complaint for the first time on June 8, 2011 [ECF No. 15] (the "Amended Complaint"). Some six years later, the parties were still involved in conducting paper discovery and were having discovery disputes. More issues arose when the Banks received interrogatory responses from the Trustee that revealed that the parties had a different understanding of the meaning of certain counts of the Amended Complaint and the Trustee's legal theories. The Banks brought this dispute to the Court's attention by filing their Motion for an Order to Show Cause Why the Trustee Should Not be Denied Leave to Amend the Complaint and Why His Interrogatory Responses Should Not Be Stricken [ECF No. 309].

Although the deadline to amend the complaint had long passed,[5] after a hearing, the Court granted leave to the Trustee to further amend *only* counts 3, 10, 16, and 20 of the Amended Complaint (to add/clarify allegations of "Debtors' actual fraudulent intent"), subject to the Banks' right to move to dismiss them. The Court hoped to bring clarity to the Trustee's theories, the Banks' defenses, and the issues pending for trial. Accordingly, the Trustee filed his Second Amended Complaint [ECF No. 421] (the "Second Amended Complaint"). The Banks now move to dismiss the amended counts.

The Banks acknowledge that the Trustee has always made clear that he intends to prosecute fraudulent transfer claims based on the theory that the *Banks'* alleged fraudulent intent may be imputed to the Debtors. Indeed, the sufficiency of that claim has already been tested by the Court.[6]

---

dismiss the § 548(a)(1)(A) claims in the Amended Complaint. It would not appear that the imputation analysis necessarily implicit in Judge Keir's ruling (though not expressly discussed) would change because additional transfers/counts are alleged based on the Debtors' fraudulent intent.

[5] This deadline, among others, was established pursuant to a scheduling order [ECF No. 132] entered on June 7, 2015.

[6] In their prior motion to dismiss [ECF No. 32], the Banks argued that the Trustee had not sufficiently pleaded the transferee imputation doctrine. That is, in order to impute the Banks' intent (as the *transferees* of the transfers), the Trustee was required to plead that the Banks controlled the Debtors' resources. In the Court's prior ruling [ECF No. 76], Judge Keir granted in part and denied in part the Banks' motion to dismiss. The Court refused to dismiss counts 3, 10, 16, and 20 because the Amended Complaint sufficiently alleged control by the Banks of the "Debtors' resources

The Banks object because the Second Amended Complaint now makes clear that the Trustee *also* intends to prosecute fraudulent transfer claims on the theory that the Debtors harbored a legally sufficient intent to defraud based on the self-serving actions of one of the Debtors' own officers. The Trustee alleges in the amended counts that a single officer (Larry Goldstone) who acted with improper motive (to make *himself* rich) was able to cause the Debtors to do his bidding, and that his bad intent became the Debtors' own for fraudulent transfer purposes.

In the instant Joint Motion to Dismiss [ECF No. 423] (the "Motion to Dismiss"), the Banks claim that the Second Amended Complaint goes too far by advancing theories and causes of action that were never contemplated in the Amended Complaint. They assert that this is an eleventh-hour U-turn by the Trustee because he now realizes that he will be unable to prove his original theories. The Banks seek dismissal of the Trustee's claims in counts 3, 10, 16, and 20 "to the extent they are based on the Debtors' *own* intent" to hinder, delay, or defraud the Debtors' creditors. They argue that the Trustee fails to plead claims upon which relief can be granted. (The Court will hereinafter refer to the amended allegations of counts 3, 10, 16, and 20 as the "Amended Counts.").

## II.    The Amended Counts

The Amended Counts plead that Mr. Goldstone harbored *actual intent* to hinder, delay, or defraud, which can be imputed to the Debtors and form a basis for avoidance of transfers by the Debtors under § 548(a)(1)(A).[7]

---

and disposition of assets" and "allege[d] with requisite specificity the challenged transfers, dates of the transfers, and the requisite intent." *Id.* at 30. Thus, Judge Keir found that the Trustee sufficiently pleaded imputation of the Banks' fraudulent intent as transferees.

[7] Each of the four amended counts is brought pursuant to 11 U.S.C. § 548(a)(1)(A). This section permits a trustee to avoid a transfer made with actual fraudulent intent and provides that a trustee:

> may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, *if the debtor* voluntarily or involuntarily ... made such transfer or incurred such obligation with *actual intent to hinder, delay, or defraud* any entity to which

In particular, the Second Amended Complaint alleges that Mr. Goldstone, the former CEO and President of the Debtors, caused or acceded to the transfer of hundreds of millions of dollars and other consideration to the Banks that harmed the Debtors in order to further his own financial interests. Second Amended Complaint at ¶¶ 49–59, 61–62, 77–78, 112–15, 133, 143. It alleges that Mr. Goldstone knew that the Banks' demands were improper, that the Banks were demanding an excessive turnover of collateral, and that the Debtors were being left in a position such that they could not pay other creditors if the Banks were paid. Second Amended Complaint at ¶¶ 112–15, 154–55, 158, 218. Nonetheless, the Second Amended Complaint alleges that Mr. Goldstone transferred (or permitted to be transferred) millions of dollars to the Banks to preserve his personal interest in Thornburg Mortgage Advisory Corporation ("TMAC"), a related entity that received millions from the Debtors and that Goldstone hoped would survive bankruptcy and make him truly wealthy. Second Amended Complaint at ¶¶ 26–29, 112–15.

The Second Amended Complaint alleges that Mr. Goldstone, among others, devised a strategy to preserve assets known as the "Thrift Strategy." Under this plan, TMAC would form a thrift holding company, offer 80% of the equity to the public, and retain 20% for itself. This new holding company, controlled by TMAC, would acquire certain TMST subsidiaries. TMST would pay TMAC an incentive fee for the sale of the subsidiaries and TMAC would then receive fees from both TMST and the thrift. Second Amended Complaint at ¶¶ 26–29. The pursuit of this strategy purportedly incentivized Mr. Goldstone to execute the Override Agreement (a comprehensive restructuring agreement between the Banks and the Debtors), avoid bankruptcy,

---

the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; ...

(emphasis added).

and make payments as demanded by the Banks.  Second Amended Complaint at ¶¶ 61, 112–16, 184.  The Second Amended Complaint alleges that Mr. Goldstone "*knew with substantial certainty*" that failing to prevent the transfers engineered by the Banks' domination and control over the Debtors' property would hinder, delay, or defraud the Debtors' other creditors.  Second Amended Complaint at ¶¶ 220, 289, 350, 387 (emphasis added).

Success of the Thrift Strategy would enrich TMAC's shareholders, which included Garrett Thornburg and Mr. Goldstone, but not TMST.  Second Amended Complaint at ¶¶ 26, 114. Although the Second Amended Complaint coined the term "Thrift Strategy" and added many factual allegations related to such a strategy, both the Amended Complaint and the Second Amended Complaint alleged that this "global restructuring plan" was intended to "preserve[] substantial value and contemplated full recoveries, not only for the [Banks], but over $1.6 billion in other creditor claims."  Amended Complaint at ¶ 153; Second Amended Complaint at ¶ 163. The Second Amended Complaint alleges that the Thrift Strategy "depended on TMST avoiding bankruptcy and preserving its assets."  Second Amended Complaint at ¶ 113.

The Second Amended Complaint alleges that TMAC would have benefited from the Thrift Strategy in three ways: (i) as a shareholder of the thrift; (ii) from incentive fees tied to the sale of TMST subsidiaries to the thrift; and (iii) from future management fees that would be earned by providing ongoing business, financial, human resources, and day-to-day operations services to the thrift and TMST.  Second Amended Complaint at ¶¶ 26, 28–29, 114.  The inference is that Mr. Goldstone may have had a limited opportunity to buck the Banks' demands (which he knew to be unreasonable, if not extra-contractual and counter to the Debtors' best interest), but that he knowingly and willingly conceded to the demands and helped effectuate the transfers because he believed that the transfers were the best way to protect his individual wealth going forward.

The Thrift Strategy was not conceived in the shadows. The Debtors' largest investor, MatlinPatterson (which had two seats on the Debtor's board of directors), supposedly participated in meetings regarding the Thrift Strategy and was allegedly willing to convert its debt into equity in order to support this strategy. Second Amended Complaint at ¶¶ 160–62. MatlinPatterson was not on board with all of the Debtors' ideas. Despite the Banks putting pressure on Mr. Goldstone to raise additional capital from MatlinPatterson in 2008 to underwrite demands for additional collateral, MatlinPatterson refused. Second Amended Complaint at ¶ 113. It is unclear what relationship, if any, existed between MatlinPatterson and TMAC or any of the TMST subsidiaries that were to be sold to TMAC.

The Amended Counts and the transfers they seek to avoid are the following: (i) *count 3* seeks to avoid as fraudulent a $219 million payment from the Debtors to the Banks as well as transfers in the amount of $639.5 million in principal and interest payments; (ii) c*ount 10* seeks to avoid as fraudulent a release given to the Banks as well as other transfers in the amount of $72.3 million from funds invested into TMST primarily by MatlinPatterson, as well $375.3 million in principal and interest payments from December 2008 to March 2009; (iii) *count 16* seeks to avoid as fraudulent the March Forbearance Agreements (as defined in the Second Amended Complaint); and (iv) c*ount 20* seeks to avoid as fraudulent additional releases given to the Banks by the Debtors.

## III.   The Banks' Arguments in Support of Dismissal of Counts 3, 10, 16, and 20

The Banks make several arguments in support of dismissal of the Amended Counts.

First, the Banks argue that the allegations about Mr. Goldstone's self-interest in pursuing the Thrift Strategy do not create an inference that intent to hinder, delay, or defraud the Debtors' creditors existed. They argue that the Second Amended Complaint alleges that Mr. Goldstone pursued the Thrift Strategy as a potential solution to the Debtors' liquidity crisis, that this strategy

was intended to achieve a full recovery for all creditors, and that it was fundamentally aligned with the interests of TMST's creditors, even if it did benefit Mr. Goldstone personally. The Banks point to allegations that they say show that the Thrift Strategy was intended to "preserve[] substantial value and contemplated full recoveries, not only for the Defendants, but [for] over $1.6 Billion in other creditor claims." Second Amended Complaint at ¶ 163. The mere fact that this strategy had incidental benefits for Mr. Goldstone personally, the Banks maintain, is irrelevant because the Thrift Strategy itself was intended to achieve full recoveries *for creditors*.

Second, the Banks argue that the new allegations of the Debtors' own intent are irreconcilable with existing allegations of domination and control of the Debtors by the Banks. If the allegations that "the Debtors were the Defendants' captive instrumentality" are true, then Mr. Goldstone's motivations are irrelevant, because a captive instrumentality has no will of its own.

Third, the Banks argue that Mr. Goldstone's intent, even if actually fraudulent, cannot be imputed to the Debtors because none of the challenged transfers were a result of his unilateral act. Instead, each transfer wa approved by the board of directors and/or a committee of the board. The Banks urge that under the correct imputation standard, a single officer or director's fraudulent intent is insufficient. They point out that the board and the board committee that approved certain of the challenged transfers included two representatives from MatlinPatterson and that MatlinPatterson stood to lose the most from the challenged transactions. They say that there are no allegations in the Second Amended Complaint that Mr. Goldstone controlled the board or the committee, or that any other member of the board or the committee had actual intent to hinder, delay, or defraud the Debtors' creditors.

Fourth, the Banks claim that, despite vaguely referring to other officers and directors of the Debtors in arguing the Debtors' intent to delay, hinder, or defraud, the Second Amended

Complaint contains no allegations of anyone's intent other than that of Mr. Goldstone's. Thus, the Banks argue that the entire imputation analysis focuses exclusively on Mr. Goldstone's intent.

Fifth, the Banks maintain that the allegations in the Second Amended Complaint are not sufficient to give rise to an inference of actual fraud by the Debtors. They say that the Trustee has cited only two "badges of fraud"—inadequate consideration and insolvency—and that these cannot give rise to an inference of actual intent because the cash transfers were made to satisfy antecedent debt.

## IV. Imputation of Intent Under § 548 (a)(1)(A)—May a Single Officer's Intent Be Imputed to the Corporation?

At the outset, the Court must decide whether Mr. Goldstone's allegedly fraudulent intent may be imputed to the Debtors because the Amended Counts hinge on that imputation theory to satisfy § 548(a)(1)(A). If his intent cannot be imputed to the Debtors, the Motion must be granted. The Banks say that Mr. Goldstone's intent cannot be imputed; the Trustee says that it can. Ultimately, after determination and analysis of the applicable areas of law (e.g., choice of law, corporate law, agency law), the Court agrees with the Trustee.

### A. Choice of Law

Determining whether a corporate officer's fraudulent intent may be imputed to the corporation is an issue governed by state law. *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83, 85, 88 (1994) (holding that federal common law may not displace state law on imputation unless a "federal policy or interest … is compromised" or there exists a contradictory "explicit federal provision."); *In re Gaston & Snow*, 243 F.3d 599, 605–06 (2nd Cir. 2001) (explaining that federal choice of law rules are a form of federal common law). Fourth Circuit case law holds that absent an "overwhelming federal policy," forum state choice of law rules apply when a bankruptcy court is adjudicating an issue of state law, even if there is a federal statutory scheme operating in the

10

background.  *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir. 1988) (explaining that a debtor's property rights are inherently determined by state law and therefore federal common law should not apply); *In re Infinity Business Group, Inc.*, 497 B.R. 794, 804 (D.S.C. 2013) (applying choice of law rules of forum state over tort actions and imputation issues); *Terry v. June*, 359 F. Supp. 2d 510, 518 (W.D. Va. 2005),  *order amended on reconsideration*, 420 F. Supp. 2d 493, 499 (W.D. Va. 2006) (applying federal choice of law rules to securities regulation matter because there existed a "significant conflict between federal interests involved and the application of state law").

Absent from the Banks' and Trustee's papers is a discussion of choice-of-law.  Their papers point to the laws of various jurisdictions (Delaware, Maryland and New York, etc.) without explaining why.  *See, e.g.*, Motion to Dismiss at ¶ 70 (citing cases from the Fourth Circuit and from the Southern District of New York (applying Delaware law)); Trustee's Opposition to the Motion to Dismiss [ECF No. 427] at ¶¶ 74–75 (citing cases from the Southern District of New York (applying Delaware law) and Maryland).  This Court must first determine what law applies.

Of the three Debtors implicated in this adversary proceeding, two (Thornburg Mortgage Home Loans, Inc. and Thornburg Mortgage Hedging Strategies, Inc.) are Delaware corporations. *See* Second Amended Complaint at ¶¶ 7–8.  TMST is a Maryland corporation with its principal place of business in New Mexico.  Second Amended Complaint at ¶ 6.  The Court has the impression from a reading of the Second Amended Complaint that New Mexico serves as the principal place of business, or nerve center, for all the Debtors as a corporate group and nothing dispels that impression.

This Court is situated in the District of Maryland.  As the forum state, Maryland choice-of-law rules apply to the imputation analysis.  *O'Melveny*, 512 U.S. at 83; *Simon v. Union Hosp.*

*of Cecil Cty., Inc.*, 15 F. Supp. 2d 787, 793 (D. Md. 1998), *aff'd in part, rev'd in part*, 199 F.3d 1328 (4th Cir. 1999) (remarking that federal courts apply the law of the state where the court sits unless disputed by the parties) (citations omitted).  It is unclear how Maryland courts would characterize imputation in a fraudulent conveyance claim, *i.e.*, as a contract or a tort, and therefore unclear which jurisdiction's laws Maryland courts would apply.  *Sheehan v. Saoud*, 650 Fed. Appx. 143, 154–55 (4th Cir. 2016) (unreported) (discussing the court split on whether fraudulent conveyances sound in tort or contract and declining to decide the issue); *Ashmore for Wilson v. Dodds*, 262 F. Supp. 3d 341, 358 (D.S.C. 2017) ("Whether a fraudulent conveyance claim should be characterized as a tort action is uncertain and disputed among American jurisdictions.").

If fraudulent conveyances sound in tort law, then New Mexico law would likely apply because "Maryland applies the doctrine of *lex loci delicti* to tort actions*,* which provides that the substantive law of the state where the wrong occurs governs."  *Solomon v. Nat'l Enquirer Inc.*, 1996 WL 635384, at *1 (D. Md. June 21, 1996) (unreported) (*citing Rockstroh v. A.H. Robins Co.,* 602 F. Supp. 1259, 1262 (D. Md. 1985)).  Because the Plaintiffs are corporations, their injury is suffered where their principal place of business is located.  *Infinity Bus. Grp., Inc.*, 497 B.R. at 804 (citing *Central West Virginia Energy Co. Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 104 (4th Cir. 2011) (explaining the nerve center test).  On the other hand, if fraudulent conveyances sound in contract, Maryland applies the doctrine of *lex loci contractus* to contract actions, which requires that "the law of the jurisdiction where the contract was made" apply.  *Cunningham v. Feinberg*, 441 Md. 310, 326 (Md. 2015).  Maryland courts occasionally look to the Restatement (Second) Conflict of Laws, although it has not been formally adopted in Maryland.  *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 572–73 (Md. 1995) (examining the Restatement (Second) Conflict of Laws but refusing to adopt the "most significant relationship" test).

The choice-of-law analysis does not make clear which state's laws apply, but this Court will apply Maryland law to the instant imputation question for two reasons. First, the parties do not raise the issue. Where parties agree *sub silentio* on which jurisdiction's law applies,[8] a federal court will apply the law of the undisputed jurisdiction. *Simon*, 15 F. Supp. 2d at 793. If neither party discusses jurisdiction at all, a federal court will apply the law "of the state in which the federal court sits" unless the issue is raised. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991). Second, Delaware, Maryland, and New Mexico each follow traditional principles of agency and imputation law, such that there is no meaningful difference in the laws of these jurisdictions. *See, e.g.*, *Stewart v. Wilmington Trust SP Servs.*, Inc., 112 A.3d 271, 302–03 (Del. Ch. 2015) ("[A] basic tenet of [Delaware] corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."); *Ace Dev. Co. v. Harrison*, 196 Md. 357, 365 (Md. 1950) ("A corporation, operating through its agents within the scope of their authority within corporate power, is liable for its acts the same as is a natural person. This would seem to be axiomatic."); *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 437 (N.M. 1994) ("A corporation can act only through its officers and employees, and any act or omission of an officer or an employee of a corporation, within the scope or course of his or her employment, is an act or omission of the corporation.").

### B.  Applicable Agency and Imputation Principles

Accordingly, the Court turns to an analysis of Maryland agency and imputation principles. Under Maryland law, the existence and extent of an agency relationship is a factual matter and the

---

[8] The parties appear to agree that Fourth Circuit law controls but that two cases from the Southern District of New York applying Delaware should be persuasive. *See, e.g.*, Motion to Dismiss at ¶ 70; Trustee's Opposition to the Motion to Dismiss at ¶¶ 74–75.

plaintiff bears the burden of proof. *Haley v. Corcoran*, 659 F. Supp. 2d 714, 725 (D. Md. 2009). When determining the issue, courts consider: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Green v. H & R Block, Inc.*, 355 Md. 488, 503 (Md. 1999). The parties do not appear to dispute that Mr. Goldstone was the Debtors' agent, and the pleadings demonstrate that as President and CEO of the Debtors, he possessed actual authority to bind them. Second Amended Complaint at ¶ 39; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 565 (Md. App. 2008) (noting that "[a] person may be deemed an agent based on actual authority or apparent authority. Actual authority exists only when the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it.") (citations omitted). Having established that Mr. Goldstone was an agent of the Debtors, the next step is determining whether his intent may be imputed to the Debtors, as transferors.

### C. *Tribune* and *Lyondell*

The Banks argue that whether the Trustee can carry his pleading burden for intent, and whether intent can be imputed to the Debtors, rises and falls on the allegations about Mr. Goldstone alone. The Court agrees. Although the Trustee mentioned certain other officers and directors in the Second Amended Complaint, there are no specific allegations about any of them other than Mr. Goldstone (apart from a minor role played by Deborah Gage in consummating a wire transfer at Mr. Goldstone's direction). Because Mr. Goldstone stands alone, the Banks argue that the allegations regarding him, even if true, and even if sufficient to show § 548(a)(1)(A) actual intent, cannot be attributed to the Debtors because Mr. Goldstone lacked unilateral authority to approve the challenged transfers and did not act without approval.

14

There is little authority addressing whether to impute the intent of a single officer/agent to a corporation in an actual fraudulent conveyance action, including in the Fourth Circuit and Maryland. Accordingly, this Court looks to persuasive authority that has addressed this imputation question. That leads to two cases from the Southern District of New York. These cases are based on Delaware law[9] and they address whether a single corporate director's intent may be imputed to the transferor corporation in a fraudulent conveyance action. They reach disparate conclusions. Not surprisingly, the Trustee urges one and the Banks urge the other. The Trustee cites to *In re Lyondell Chemical Company*, which holds that a CEO's fraudulent intent may be imputed to a corporation under § 548 when that corporation was the transferor in an allegedly fraudulent conveyance. 554 B.R. 635 (S.D.N.Y. 2016). The Banks cite to *In re Tribune Co. Fraudulent Conveyance Litigation*, which finds that if there is a board of directors, it is the board's intent that controls, and the intent of a single officer cannot be imputed to the corporation. No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) (unreported).

This Court finds the reasoning of *Lyondell* to be more appropriate than *Tribune*,[10] and believes that the district court opinion in *Lyondell* offers significant insight. Interpreting applicable Delaware law, the *Lyondell* district court dealt with a similar imputation scenario with respect to

---

[9] As noted *supra*, courts in Delaware, Maryland, and New Mexico adhere to traditional principles of agency and imputation law and are congruous in the application of those principles.

[10] While the Banks cite *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245 (4th Cir. 1967) and suggest that it is consistent with the more restrictive *Tribune* standard, *supra*, this Court notes that *Phoenix* is a surety case, and that it cannot be read so broadly as the Banks would like. Among other things, the *Phoenix* court, tasked with interpreting a surety bond, cites the "general rule" that "knowledge of an officer of the corporation obtained while acting *outside the scope of his official duties* … is not, merely because of his office, to be imputed to the corporation." *Id*. at 250 (quoting *William Danzer & Co. v. Western Md. Ry.*, 164 Md. 448 (Md. 1933)). *Lyondell* makes the point that the officer in its case was acting inside the scope of his duties. Similarly, the Second Amended Complaint in this case alleges that making or allowing the challenged transfers was in the scope of Mr. Goldstone's duties. *See* Second Amended Complaint at ¶¶ 39A, 61, 86, 115, 158, 184.

alleged fraudulent transfers and held that one director acting within the scope of his authority was sufficient to impute intent "to hinder, delay or defraud" to an entire corporation.

In the previous proceeding, the *Lyondell* bankruptcy court had granted the shareholder defendants' motion to dismiss, holding that the "bad acts" of one individual (the CEO/chairman of the board) could not be imputed to the corporation because any action by the CEO required the approval of the board of directors.  The bankruptcy court reasoned that it was the board's intent, not the intent of an individual director, that controlled, and that in order for the corporation to possess actual intent under § 548(a)(1)(A), the trustee should have pleaded that a "critical mass" of directors harbored actual intent.  *Lyondell*, 554 B.R. at 643.  The *Lyondell* bankruptcy court also believed that the trustee's actual fraud count fell short because the trustee only pleaded that the corporate officer was attempting to enrich himself; there was no allegation that the officer had an intent to injure creditors.  *Id.*

On appeal, the *Lyondell* district court reversed and commented that neither the bankruptcy court nor the defendants "cited any authority for the proposition that a corporate officer's knowledge and intent may not be imputed to the corporation when the corporation's board must vote on the decision at issue."  *Id.* at 649.  The court clarified that the "wrongful act" itself does not need to be within the course of employment for intent to be imputed, but rather,

> [i]n assessing whether an act falls within the scope of employment, it is important to remember that a corporation can act only through its agents. "When corporate officers carry out the everyday activities central to any company's operation and well-being—such as issuing financial statements, accessing capital markets, … moving assets between corporate entities, and entering into contracts—their conduct falls within the scope of their corporate authority."

*Id*. at 648 (internal citations omitted).  The district court imputed the single director's intent to the corporation for the § 548(a)(1)(A) actual fraud count under traditional agency principles.

In *Tribune*, the court sought to determine "whose intent should be imputed to [the debtor]." 2017 WL 82391, at *5.  The court cited Delaware law for the proposition that "courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation."  *Id*. (citing *In re Elrod Holdings Corp.*, 421 B.R. 700, 712 (Bankr. D. Del. 2010) (deciding whether to impute transferee's intent to corporate transferor)).  The *Tribune* court considered several groups of actors (the shareholders, the board of directors, and the officer defendants) and evaluated whether the intent of each group was relevant for imputation purposes.  The court dispensed summarily with any notion that the shareholders' intent was imputable (because, among other reasons, the trustee did not make this allegation).  The court then looked at the special committee of independent directors, to which the trustee alleged the board had delegated its authority over the leveraged buyout ("LBO") at issue in the case.  The court found that they were "clearly in a position to control the outcome of the Board's vote on the LBO" and, to the extent the trustee pleaded an actual intent to hinder, delay or defraud, the "intent [of the independent directors] may be imputed to the corporation for purposes of the Trustee's fraudulent conveyance claim."  2017 WL 82391, at *6.

The court declined to impute the intent of an individual officer defendant to the corporation unless the particular officer was "in a position to control the disposition of [the transferor's] property."  *Id*.  The court also cited *In re Roco Corp.*, 701 F.2d 978 (1st Cir. 1983), as "particularly appropriate" support for its holding that imputing a single individual's intent is inappropriate unless that individual "has sufficient control to effectuate the acts alleged to have been fraudulent." *Tribune*, 2017 WL 82391, at *6, *9.

Relying on *Tribune*, the Banks argue that no matter what private motive Mr. Goldstone harbored, Mr. Goldstone did not have the ultimate authority to transfer assets because the transfers were approved by TMST's board of directors.[11]  This Court does not distinguish *Lyondell* so handily.  The bankruptcy court in *Lyondell* and the district court in *Tribune* both relied on *Roco* for the proposition that, for an individual's intent to be imputed to a corporation, the individual must be in a position to control the disposition of the corporation's property.  The *Lyondell* district court correctly pointed out that *Roco* was addressing the imputation of intent from the *transferee* to the *transferor*, not imputation generally of a corporate officer to a corporation.  This confusion is a byproduct generated when two related, yet distinct, concepts have the same name.  *See Lyondell*, 554 B.R. at 649 ("*Roco* is entirely consistent [with] other decisions addressing the question of imputation in the context of transfers from a corporation to a third-party transferee.  In such situations, the imputation of the transferee's intent to the corporate debtor-transferor under §548(a)(1)(A) requires actual control of the debtor.") (citations omitted).

A survey of Delaware and Maryland imputation case law indicates that when imputing *the transferee's intent*, the control test explained in *Roco* applies; in all other contexts, traditional rules of agency apply.[12]  Courts in other jurisdictions likewise hold that an individual director's intent

---

[11]  The Second Amended Complaint does contain allegations that Mr. Goldstone had authority over all of the Debtors' dealings with the Banks.  *See* Second Amended Complaint at ¶ 39.

[12]  For example, in *Elrod Holdings*, the Delaware bankruptcy court determined that a transferee's intent may be imputed to the transferor corporation when the transferee dominated or controlled the corporation.  421 B.R. at 709–10 (citing 5 Collier on Bankruptcy ¶ 548.01 at 548–24).  As the *Elrod* court remarked, this type of imputation generally arises when shareholders of the transferor exercise their control over the corporation to "transfer[] assets to themselves as transferee."  *Id.* at 712.  Simultaneously, other Delaware courts recognize the general principle that "[a] principal is liable for the fraud of an agent even though the fraud was committed without the knowledge, consent or participation of the principal if the act was done in the course of the agent's employment and within the apparent scope of the agent's authority."  *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 798–99 (Del. Ch. 2014) (citing *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super. 1973)).  *See also, Sandvik AB v. Advent Intern. Corp.*, 83 F. Supp. 2d 442, 448 (D. Del. 1999), *aff'd* 220 F.3d 99 (3d Cir. 2000) (holding "[w]hen there is an agency relationship … the principal may be liable for the fraudulent acts of its agent."); *Purdum v. Edwards*, 155 Md. 178, 141 A. 550, 552–53 (Md. 1928) (holding corporate principal liable for fraudulent statements made by its president while acting as agent); *Jones v. Sherwood Distilling Co.*, 150 Md. 24, 132 A. 278, 281 (1926) ("Acts of fraud by the agent, committed

may only be imputed to the corporation where the individual controlled the corporation's property; however, these cases uniformly apply to the transferee's intent, not that of the transferor.[13]

Where imputing a director's intent to a transferor corporation is at issue, traditional rules of agency law apply, not the "dominion and control" test espoused by *Tribune* and the Banks.

## V.    Motion to Dismiss Standards Under Rule 12(b)

In deciding a motion to dismiss, the Court "must accept as true all of the [plaintiff's] allegations and must construe factual allegations in the light most favorable to the plaintiff." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). To defeat a motion to dismiss under Rule 12(b)(6), as made applicable to this adversary proceeding by Bankruptcy Rule 7012, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). When assessing plausibility, well-pleaded factual allegations must be accepted as true and such facts and all reasonable inferences derived from those allegations must be viewed in the light most favorable to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Plausibility is established when the complaint's factual allegations give rise to an inference of liability sufficient to move the claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678. On the other hand, a complaint should be dismissed if it does

---

in the course or scope of his employment, are also binding on the principal, even though the principal did not in fact know of or authorize the commission of the fraudulent acts, and although he derives no benefit from the success of the fraud.") (citations omitted).

[13] *See e.g., In re Acequia, Inc.*, 34 F.3d 800, 805–06 (9th Cir. 1994) (holding that controlling shareholder's intent may be imputed to the corporation because, *inter alia*, he controlled the corporation's finances); *In re L & D Interests, Inc.*, 350 B.R. 391, 400 (Bankr. S.D. Tex. 2006) (interpreting § 548 to mean that "the intent of a corporation's president, director, and sole shareholder to defraud may be imputed … because the individual is in a position to control the disposition of the corporation's property."); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 91 (Bankr. S.D.N.Y. 1999) (imputing broker's intent to corporation where the broker exercised control over the corporation), *aff'd*, 263 B.R. 406 (D.D.N.Y. 2001); *Francis v. United Jersey Bank*, 162 N.J. Super. 355, 367 (N.J. App. Div. 1979), *aff'd*, 87 N.J. 15, 432 A.2d 814 (1981) (imputing intent, under New Jersey fraudulent conveyance statute, of two principal stockholders to the corporation because they were the "controlling forces" of the entity).

not contain "enough factual matter (taken as true)" to demonstrate "plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–59 (2007).

## VI.   Heightened Standard for Pleading Fraud under Rule 9(b)

Engrafted onto the requirement of Rule 12(b)(6) is the heightened pleading standard for fraud claims under Rule 9(b). Complaints asserting fraud claims must do more than give a short and plain statement of the claim as required by Rule 8. They must also comply with the heightened pleading standard of Rule 9(b). Because § 548(a)(1)(A) authorizes avoidance of a transfer based on actual fraud (*i.e.*, the intent to hinder, delay, or defraud), pleading under this statute must meet this heightened standard. *See In re AgFeed USA, LLC*, 546 B.R. 318 (Bankr. D. Del. 2016); *In re Licking River Mining*, 571 B.R. 241 (Bankr. E.D. Ky. 2017). The rationale for a heightened pleading standard for fraud claims is as follows:

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*In re USDigital, Inc.*, 443 B.R. 22, 33 (Bankr. D. Del. 2011). This standard applies to actual fraudulent transfer claims under § 548(a)(1)(A). *In re Madeoy*, Adv. No. 14-00882-TJC, 2015 WL 4879960, at *9–10 (Bankr. D. Md. July 30, 2015) (unreported). Rule 9(b) requires a plaintiff to plead "the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)).

Stated differently, a claim subject to the heightened Rule 9(b) standard must allege "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *In re Bernard L. Madoff Inv. Securities LLC*, 445 B.R. 206, 220 (S.D.N.Y. 2011). Notwithstanding the particularity requirement of Rule 9(b), allegations of actual fraudulent intent may be pleaded generally. *Id*. at 219; Fed. R. Civ. P. 9(b).

## VII.    The Relaxed Rule 9(b) Standard for a Trustee

Bankruptcy courts have routinely concluded that relaxing the particularity standard of Rule 9(b) is appropriate where the fraud claims are brought by a bankruptcy trustee. *See, e.g.*, *In re Rite Way Elec., Inc.*, 510 B.R. 471, 480 (Bankr. E.D. Pa. 2014); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009); *In re White Metal Rolling & Stamping Corp.*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998); *In re Hollis & Co.*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988); *In re McGuff*, 3 B.R. 66, 70 (Bankr. S.D. Cal. 1980). This is because of a "presumption that the Trustee, as a third party, is disadvantaged with respect to information regarding frauds committed against the debtor." *In re Atomica Design Grp., Inc.*, 556 B.R. 125, 146 (Bankr. E.D. Pa. 2016); *accord Rite Way*, 510 B.R. at 480; *Fedders*, 405 B.R. at 544; *see also In re O.P.M. Leasing Servs., Inc.*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983) (trustee "must plead fraud on secondhand knowledge for the benefit of the estate and all of its creditors").

"[T]he degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987). Where, as here, the parties are still in the midst of written discovery and have not yet had the benefit of deposition testimony, relaxing the particularly standard is appropriate. Moreover, "[w]hen the trustee's lack of personal knowledge is compounded with complicated issues and transactions

which extend over lengthy periods of time, the trustee's handicap increases and courts, therefore, should afford him or her even greater latitude." *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999).

## VIII.   Inconsistent Allegations Regarding Mr. Goldstone's Actual Intent to Defraud and Domination and Control Theory

The Banks assert that it is not possible, as a matter of law, for the Banks to dominate and control the Debtors to the point where the subject transactions were involuntary, while the Debtors simultaneously possessed § 548(a)(1)(A) actual fraudulent intent.  The Trustee responds that the allegations in the Second Amended Complaint are *not* contradictory and that even if they are, Rule 8(d) expressly permits him to plead inconsistent legal theories, claims, and even factual allegations in the alternative.  *See Erie Ins. Exch. v. Stark*, 962 F.2d 349, 354 (4th Cir. 1992).

A focal point of the Second Amended Complaint is the extent to which the Banks dominated and controlled the Debtors, rendering the Debtors unable to act in their own best interest and bowing to financial pressure put on them by the Banks to enter into agreements and make payments that were not in their best interest and may have been illegal and extra-contractual. These allegations of control and financial strong-arming by the Banks form the basis for the Trustee's imputation theory as against the Banks under § 548(a)(1)(A).

The Banks argue that the Trustee's theory in the Amended Counts that Mr. Goldstone controlled the Debtors and possessed fraudulent intent is simply irreconcilable with a theory that the Banks dominated and controlled the Debtors.  The Banks maintain that intent requires volition and a captive instrumentality has no will of its own, citing *Stifel v. Hopkins*, 477 F.2d 1116 (6th Cir. 1973) for the proposition that an action cannot be both voluntary and involuntary.  While this case has an appealing sound bite ("Intent, which is of its very nature voluntary, cannot co-exist

with compulsion"), it is misplaced.  In the quote, *Stifel* was citing older authority (that it declined to adopt).  *Stifel* stands for the proposition that compulsion and intent *can* co-exist.

Rule 8(d) expressly permits the pleading of inconsistent claims and defenses.  The Court will not, at this early stage in the case, dismiss counts on their face because they appear to be inconsistent, either factually or legally.  *See, e.g.*, *In re Voltin*, No. 15-19852-JS, 2016 WL 1423717, at *4 (Bankr. D. Md. Apr. 8, 2016) (unreported) (refusing to dismiss complaint even though allegations were internally inconsistent); *Jeannie's Jewelers, Inc. v. ADT Sec. Services, Inc.*, No. 1:12CV265 JCC/IDD, 2012 WL 1869319, at *5 (E.D. Va. May 22, 2012) (unreported) (refusing to dismiss plaintiff's breach of contract claim despite plaintiff's assertion that a contract never existed); *see also* 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1283 (3d ed. 2010) (Rule 8(d)(3) permits pleading inconsistent facts and inconsistent legal theories).

### IX.  The Allegations of the Amended Counts are Adequate Under Rules 9(b) and 12(b)(6) to State a Claim for Relief Under § 548(a)(1)(A)

Fraudulent intent, usually not susceptible to direct evidence, may be pleaded and proved by "badges of fraud."  *See In re Lehman Bros. Holding, Inc.*, 469 B.R. 415, 447 (Bankr. S.D.N.Y. 2012) ("The Amended Complaint pleads sufficient 'badges of fraud' to satisfy Rule 9(b) and create a 'strong inference of fraudulent intent.'").[14]  Badges of fraud are but one way, at the pleading stage, to fulfill the heightened pleading requirement of Rule 9(b).  *In re Summit Place, LLC*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002) ("While not direct evidence of fraud, the concurrence of facts

---

[14]  The Trustee alleges that at the time of the transfers at issue in the Second Amended Complaint, the Debtors were insolvent or undercapitalized, they received no or inadequate consideration in exchange, and the Banks were not dealing with Debtors at arm's length.  In fact, a "close relationship" and an "unconscionable discrepancy" of value are two of the badges of fraud cited in *Lehman Brothers*.  469 B.R. at 447.  Allegations pertinent to the Court's analysis are discussed more fully, *supra*.

and circumstances, including the badges of fraud, can lead to the conclusion that the debtor's conduct was motivated by such fraudulent intent.").

The court in *Lehman Brothers* cited the following badges of fraud that, when alleged in a complaint, may create a "strong inference" of fraudulent intent:

> (i)     a close relationship among the parties to the transaction;
> (ii)    a questionable or hasty transfer not in the ordinary course of business;
> (iii)   the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor;
> (iv)    the chronology of the events and transactions under inquiry;
> (v)     the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
> (vi)    whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

469 B.R. at 447.

A common thread through all of the Trustee's allegations of intent to hinder, delay, or defraud in the Amended Counts is the underlying contention as to motive: that Mr. Goldstone helped the Banks exert dominion over the Debtors by acceding to near-impossible demands by the Banks just to keep the Debtors out of bankruptcy, thereby advancing his own interest in the Thrift Strategy.  In addition, the Trustee alleges that Mr. Goldstone knowingly acquiesced to certain transfers of funds from the Debtors to the Banks at the expense of other creditors because these payments were in Mr. Goldstone's self-interest.  Further, the Trustee alleges a lack of consideration for the transfers made at a time when the Debtors were insolvent or undercapitalized.

The Banks argue that lack of consideration is not a badge of fraud in these circumstances because all of the transfers were made for consideration—either to induce the Banks to forbear from exercising their contractual rights or by reducing the amount of the Banks' claims against the

24

Debtors.  The allegations of the Amended Counts make clear the Trustee's central point that even if consideration existed, it was inadequate.  The exchange of consideration does not, in and of itself, invalidate a badge of fraud.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 406 (Bankr. S.D.N.Y 2007) (explaining that "[a]n unconscionable discrepancy between the value of the property transferred and the consideration received; *i.e.*, inadequacy of consideration" *is* a badge of fraud).

This Court need not engage in a formulaic analysis of what badges of fraud are pleaded and indeed need not find that any are pleaded.

> "No specific combination of badges is necessary for a finding of actual intent and the presence of any of the badges of fraud does not compel such a finding." *Andrews v. RBL, L.L.C. (In re Vista Bella, Inc.)*, Adversary No. 12–00060–MAM, 2013 WL 2422703, at *15 (Bankr.S.D.Ala. June 4, 2013) (citing *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 10 n. 13 (S.D.N.Y.2007)). Rather, the "badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent," and whether such is the case "is a heavily fact-dependent question" that is rarely amenable to summary judgment. *Id.* (citing *In re Canyon Sys. Corp.*, 343 B.R. 615, 636 (Bankr.S.D.Ohio 2006)).

*In re S. Home & Ranch Supply, Inc.*, 515 B.R. 699, 705 (Bankr. N.D. Ga. 2014).  Pleading badges of fraud is but one way to comply with the heightened pleading standard of 9(b).

> [T]he traditional badges of fraud are not the sole indicators of actual fraudulent intent. The traditional badges of fraud represent *examples* of indicators of actual fraudulent intent, culled from decades of case law. They are intended to be guideposts—as opposed to ineluctable factors—in a court's analysis of the totality of the circumstances to determine whether a transfer was made with actual fraudulent intent.

*In re Rollaguard Security, LLC*, 591 B.R. 859, 878 (Bankr. S.D. Fla. 2018) (emphasis added).

For a transfer to be avoidable, § 548(a)(1)(A) requires that a plaintiff prove that the transfer was made "with actual intent to hinder, delay, or defraud" present or future creditors of the debtor. Section 548(a)(1)(A) is drafted in the disjunctive—the Court need only find that the Amended Counts state a claim that the Debtors (through Mr. Goldstone) made relevant transfers with the intent to hinder, the intent to delay, *or* the intent to defraud. *In re Enron Corp.*, Adv. No. 03-3522, 2005 WL 6237551, at *37 (Bankr. S.D. Tex. Dec. 9, 2005) (unreported); *In re SunSport, Inc.*, 260 B.R. 88, 111 (Bankr. E.D. Va. 2000) ("There are three distinct intents that the debtor may form: the intent to hinder, the intent to delay, and the intent to defraud, any one of which is sufficient to render the transaction fraudulent.").

The Banks argue that, at most, the Amended Counts show that Mr. Goldstone was motivated by his own personal interests and that nothing in the Amended Counts allows an inference to be drawn that Mr. Goldstone (and thus the Debtors) harbored an actual intent to hinder delay or defraud creditors.

As stated in *Lyondell*,[15] § 548(a)(1)(A) intent is established if the actor believes, appreciates, or knows with substantial certainty that creditors will be hindered, delayed, or defrauded as a natural consequence of the transfer, even if the actor's actual motive is not to hinder, delay, or defraud such creditors. Thus, an officer/transferor can harbor § 548(a)(1)(A) intent even if he was trying to salvage the debtor and benefit creditors.

> The flaw in Defendant's argument is that an admitted intention to delay creditors is not immunized by the transferor's conviction that it is for the creditors' good and the debtor, if only given time, will be able to recover

---

[15] The Banks cite the *Lyondell* bankruptcy court's finding as to the intent standard. While not necessarily inconsistent, the *Lyondell* district court did comment that it was reconsidering whether the Trustee had stated an adequate § 548(a)(1)(A) count after the bankruptcy court dismissed the count. For this reason, this Court believes that reference should be made to the *district court's Lyondell* opinion for this standard.

> enough to pay them all. The possible reward does not justify the transaction
> where there is intent to delay creditors.

*MarketXT Holdings*, 376 B.R. at 408.

The Trustee has pleaded sufficient facts from which the Court can draw an inference that Mr. Goldstone had the intent to make transfers to the Banks and that he would have appreciated that the natural consequence of making out-sized transfers to the Banks would have been the delay of payments to creditors. *See Lyondell*, 554 B.R. at 651 & n.17 (explaining proof of the natural consequences of one's acts can be circumstantial evidence that the actor appreciated the consequences of his act and thus formed § 548(a)(1)(A) intent. There is no requirement that the Trustee plead (or even prove) malign intent. *See Shapiro v. Wilgus*, 287 U.S. 348, 353–54 (1932) (holding that conveyances that hindered and delayed creditors were fraudulent despite the debtor's intent to maintain the business as a going concern and ultimately benefit all creditors). Even a misguided attempt to *benefit* creditors can support a finding of fraudulent intent under § 548(a) if it is shown with substantial certainty that a result would occur that would hinder or delay recovery for creditors. *See MarketXT Holdings*, 376 B.R. at 408. Further, although the specific allegations are sufficient, it is also true that intent may be pleaded generally. Fed. R. Civ. P. 9(b); *Bernard L. Madoff Inv. Securities*, 445 B.R. at 219.

No allegations in the Amended Counts aver that Mr. Goldstone was motivated by the interests of creditors—to the contrary, the allegations state that he was motivated to preserve the Thrift Strategy to build his own wealth. As the Trustee alleges, Mr. Goldstone was substantially certain that the Debtors' other creditors would be hindered, delayed, or defrauded. The Amended Counts state that Mr. Goldstone capitulated to the Banks' demands in order to protect his own

monetary benefits flowing from TMAC with conscious appreciation of the detrimental effects on the Debtors' creditors.

Section 548(a)(1)(A) intent is a question of fact that requires a case-by-case individualized analysis, including a "subjective evaluation of the [actor's] motive." *In re Maryland Prop. Assocs., Inc.*, 2007 WL 1074069, at *20 (Bankr. D. Md. Jan. 31, 2007), *aff'd,* 309 F. App'x 737 (4th Cir. 2009). A subjective evaluation of Mr. Goldstone's intent is properly left for trial. At this stage, the Trustee has adequately pleaded intent for the purposes of § 548(a)(1)(A).

## X.    Conclusion

Based on the foregoing analysis, the Court concludes that the Amended Counts are adequate under Rules 9(b) and 12(b)(6) to state a claim for relief under § 548(a)(1)(A). The allegations sufficiently demonstrate that Mr. Goldstone: (i) had motive to engage in the relevant transactions; (ii) possessed knowledge that those transactions would be substantially certain to harm other creditors; (iii) caused or abetted the Debtors to engage in transactions that lacked consideration during a period in which (iv) the Debtors were insolvent or undercapitalized;[16] and (v) was acting within the scope of his authority and was the Debtors' agent, notwithstanding that other committees or the board of directors blessed the actions. Inconsistencies in the Trustee's theories of domination and control are not fatal to the Amended Counts. Also, it is appropriate for the Trustee at this particular stage to be given more pleading latitude than an original actor. The Court gives the Trustee such latitude at this pleading stage.

---

[16] In *Lyondell*, although the bankruptcy court did not perform a complete badges of fraud analysis, the district court determined that the trustee sufficiently pleaded fraud. Specifically, the court found that the trustee pleaded that: (i) the director had a motive to obtain a variety of benefits for himself; (ii) the assets transferred were substantially all of the debtor's assets; and (iii) the transfer was to an insider because directors received large cash payments (albeit the amount was small in comparison to the overall transaction). 554 B.R. at 654. Additionally, all the debtor's assets became subject to new liens as a result of the transaction, therefore it was obvious secured creditors would be paid prior to unsecured creditors. *Id.*

Further, the Court agrees with the observation of the court in *Lehman Brothers* that "[t]he case obviously also involves quite a lot of money.  And with so much at stake, both in terms of issues and dollars, making a decision on the merits should occur after careful consideration of a full evidentiary record …"  469 B.R. at 421.

The determination whether a complaint states a claim is primarily a legal one.  Here, where complex transactions and relationships predominate, and hundreds of millions of dollars are at stake, the Court does not believe that summary disposition is warranted.  Though the Court believes that the Trustee adequately pleaded the intent of Mr. Goldstone under Rule 9(b) as it applies to the Trustee, whether he will be able to sustain his burden at trial is, of course, a different question entirely.

The Banks' Motion to Dismiss will be denied.  A separate order will issue.


cc:     All parties
        All counsel

**END OF MEMORANDUM OPINION**